**Justin D. Leonard**, OSB 033736
    Direct: 971.634.0192
    Email: jleonard@LLG-LLC.com
**Timothy A. Solomon**, OSB 072573
    Direct: 971.634.0194
    Email: tsolomon@LLG-LLC.com
**LEONARD LAW GROUP LLC**
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
Fax: 971.634.0250

      Counsel for Amy Mitchell, Former Chapter 11 Trustee
      and Current Post-Confirmation Plan Agent

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**Data Systems, Inc.,**<br><br>               Debtor. | Case No. 16-30477-tmb11 |
| **Amy Mitchell**, Former Chapter 11 Trustee and Current Post-Confirmation Plan Agent,<br><br>             Interpleader,<br><br>   v.<br><br>**William F. Holdner**, an individual, **Richard A. Kreitzberg**, an individual, and **Internal Revenue Service,**<br><br>             Defendants. | Adv. No. 17-*[see below]*<br><br>**COMPLAINT**<br><br>**(Interpleader)** |

      The interpleading party Amy Mitchell (the "**Plan Agent**" or "**Interpleader**"), as

the former chapter 11 trustee and the current post-confirmation plan agent for the bankruptcy

estate of debtor Data Systems, Inc. (the "**Debtor**"), hereby alleges:

**Page 1 of 10 – COMPLAINT (Interpleader)**

Leonard Law Group LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

Case 17-03023-tmb    Doc 1    Filed 02/10/17

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and (b)(2)(B), (C), and (K), 28 U.S.C. § 2361, and 28 U.S.C. § 2410(a)(5); *see also Colon v. Strawberry (In re Strawberry)*, 464 B.R. 443 (Bankr. N.D. Fla. 2012).

2.      Venue is proper pursuant to 28 U.S.C. § 1409.

3.      The statutory basis for the relief requested is Fed. R. Civ. P. 22, made applicable in this proceeding by Fed. R. Bankr. P. 7022.

4.      This adversary proceeding is filed in the chapter 11 bankruptcy case of the Debtor pending in the United States Bankruptcy Court for the District of Oregon, Case No. 16-30477-tmb11 (the "**Bankruptcy Case**").

THE PARTIES

5.      The Interpleader is the former chapter 11 trustee and current post-confirmation plan agent of the Debtor in the above-referenced case.

6.      Defendant William F. Holdner, an individual, was president and major shareholder of the Debtor, and has a mailing address of 975 SE Sandy Blvd, Portland, OR 97214.

7.      Defendant Richard A. Kreitzberg, an individual, has a mailing address of POB 387, Seeley Lake, MT 59868.

8.      Defendant Internal Revenue Service ("**IRS**") has a mailing address of POB 7346, Philadelphia PA 19101-7346.

FACTS

## I.  <u>General Case Background</u>

9.      The Bankruptcy Case was filed on February 11, 2016.

10.      On May 4, 2016, the United States Trustee appointed the interpleading party as the chapter 11 trustee of the Debtor.

11.      On May 5, 2016, the Court entered an Order approving the interpleading party as the chapter 11 trustee of the Debtor.

12.      On September 30, 2016, the interpleading party (in her role as chapter 11 trustee) filed the First Amended Plan of Reorganization Dated September 30, 2016 (the "**Plan**").

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

13.     On December 7, 2016, the Court entered an Order (Docket No. 211) (the "**Confirmation Order**") confirming the Plan.

14.     The Confirmation Date was December 7, 2016.

15.     On December 13, 2016, Defendant Holdner filed a Notice of Appeal with respect to the Confirmation Order (Docket No. 216), electing to appeal the Confirmation Order to the United States District Court for the District of Oregon (the "**District Court**").

16.     Holdner did not request that the bankruptcy court stay its Confirmation Order.

17.     Holdner requested that the District Court stay the Confirmation Order during his appeal. The District Court issued an Opinion and Order denying that request.

18.     The Confirmation Order has not been stayed.

19.     Notwithstanding the entry of the Confirmation Order, this Bankruptcy Court has retained jurisdiction over various matters. *See* Plan, Section 16.1. These matters include adjudicating disputes regarding sales of the Opt-In Shares, as well as other adversary proceedings, per Section 16.1(g) and (j) of the Plan.

## II.  Plan Provision for Optional Sales of Shares by Existing Shareholders of the Debtor

20.     The Plan of Reorganization provides for all creditors of the Debtor to be paid in full, and for shareholders to be able to retain their equity interests in the Debtor.

21.     The Plan was funded through the issuance and sale of newly-issued shares (the "**Newly-Issued Shares**") to Defendant Richard A. Kreitzberg.

22.     In recognition of the Court's concern that some investors in the Debtor might prefer to "cash out" immediately, the Plan provides an option for shareholders to sell their shares at a premium over liquidation value, if they choose to do so. The Plan defines the shares of shareholders electing to sell their shares pursuant to the Plan as "**Opt-In Shares**."

23.     The Plan also addressed the Court's concern that the ongoing state court litigation regarding Holdner's alleged mismanagement of the Debtor – and the counterclaims therein – be resolved if possible. Therefore, the Plan provides in Section 4.5 that shareholders who opt to sell their shares under the Plan shall obtain a full and unconditional release from the

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

Debtor and Reorganized Debtor (the "**Debtor Release**"). Holdner had no obligation to sell his shares under the Plan. However, by exercising this option, he is entitled to receive $7/share, along with the Debtor Release – which will result in a dismissal of the pending claims for damages against him.

24.     Section 7.2 of the Plan provides that "Promptly after the Confirmation Date, the Trustee will solicit bids to purchase all of the Newly-Issued Shares and the Opt-In Shares (in any quantity) at a price higher than Richard A. Kreitzberg's $7 per share bid. The Trustee will solicit bids from other major shareholders William Holdner and Jane Baum, the other shareholders of the Debtor, and any other party known to the Trustee to be interested or potentially interested in bidding."

25.     Section 7.2 of the Plan further provides that "To the extent a qualifying overbid is received by the Overbid Deadline, the Trustee will promptly schedule and conduct an auction."

26.     Section 7.2 of the Plan further provides that "If no auction is held, the Trustee will request the Court enter an Order approving the sale of the shares at issue to Kreitzberg."

27.     No third party submitted an overbid for the Debtor's shares by the Overbid Deadline.

28.     Accordingly, the Court entered the "Order Authorizing Issuance and Sale of Common Stock of the Debtor, Pursuant to Confirmed Chapter 11 Plan" (Docket No. 226) (the "**Stock Sale Approval Order**").

29.     The Stock Sale Approval Order formally authorized the Plan Agent to cause the Debtor to issue and sell 170,000 newly-issued shares of common stock to Richard Kreitzberg, at a price of $7.00 per share ($1,190,000). *See id.*, ¶ 1.

30.     The Stock Sale Approval Order acknowledged Mr. Holdner's appeal of the Confirmation Order, but it explicitly authorized the stock sale transaction anyway, stating "Notwithstanding the pending appeal, the Confirmation Order remains effective and the Trustee may proceed with implementation of the Plan as approved by the Court." *See id.* at p. 2 n.2.

31.     No party appealed the Stock Sale Approval Order, and it is a final order.

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

32.    On or about December 23, 2016, the sale of 170,000 newly-issued shares of common stock to Mr. Kreitzberg, at a price of $7.00 per share, occurred. In exchange for the shares, the Bankruptcy Estate received a payment in the amount of $1,190,000.

33.    The funds paid by the buyer shall be used to pay creditor claims in full upon the Effective Date. The Effective Date was intended to occur in mid-February, after the Opt-In Share transactions are completed and a shareholder meeting is convened. *See* Plan, Section 13.1 ("Conditions to Effectiveness").

34.    The Debtor was operating without a complete board of directors. Besides completing the Opt-In Share transactions, the Plan provides that the Plan Agent shall hold a shareholder meeting to elect a board of directors for the Reorganized Debtor, in accordance with the Debtor's bylaws. The meeting is scheduled for February 16, 2017.

### III.   Defendant Holdner's Election to Sell His Shares; Funds Paid to Estate

35.    As explicitly authorized under both the Confirmation Order (*see* ¶¶ 10, 11) and the Stock Sale Approval Order (*see* ¶ 2), the Plan Agent caused to be filed and served to all shareholders a notice (the "**Opt-In Notice**") of their right to elect to sell their shares of common stock of the Debtor to the Buyer for $7.00 per share, should they choose to do so, noting that the offer expires February 2, 2017 (*see* Docket No. 232).

36.    The form of the Opt-In Notice was approved by the Court.

37.    Pursuant to the Opt-In Notice, Defendant Holdner elected to sell his 135,100 shares of the Debtor. A copy of Defendant Holdner's completed Election to Sell Shares is attached as **Exhibit A**.

38.    Defendant Holdner enclosed a photocopy of his stock certificates with his completed Election to Sell Shares.

39.    Holdner's election to sell his shares was timely and is valid.

40.    The aggregate purchase price for Holdner's shares, at $7.00 per share, is $945,700.

41.    Pursuant to Section 7.2 of the Plan, the winning bidder for the Debtor's shares (Defendant Kreitzberg) was required to pay money to the Bankruptcy Estate sufficient to

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

pay for all the shares of all shareholders of the Debtor who elected to sell their shares pursuant to the Opt-In Notice.

42.     Upon receiving that payment from the winning bidder, the Plan provides that the Plan Agent "shall pay the holders of the Opt-In Shares the value of such shares at the winning purchase price (or the balance of such amount after first paying off any known liens against such shares, if such shares are encumbered), cause the transfer of such shares to be registered in the corporate records, and transfer to the winning bidder the Newly-Issued Shares and the Opt-In Shares, if any." Plan § 7.2 (emphasis added).

43.     As the winning bidder under the Plan, Kreitzberg made all of the payments required under Section 7.2 of the Plan.

44.     Of the payments made by Kreitzberg, $945,700 was paid in accordance with Holdner's Election to Sell, to purchase Holdner's 135,100 Opt-In Shares at $7.00 per share (the "**Holdner Payment**").

45.     The Plan Agent is in the process of distributing funds to sellers of Opt-In Shares, pursuant to Section 7.2 of the Plan.

46.     However, for the reasons set forth below, the Plan Agent is holding the Holdner Payment and Holdner's original Election to Sell (including copies of the stock certificates in his possession) pending adjudication of this Complaint.

47.     In the meantime, the Plan Agent will move separately, pursuant to Fed. R. Bankr. P. 7067 and LBR 7067-1, to deposit the Holdner Payment in the Court's registry. If requested, the Plan Agent can deposit Holdner's original Election to Sell in the Court's registry.

## IV.  Dispute Over Right to Holdner Payment

48.     In his election to sell, Mr. Holdner warranted and represented that his Opt-In Shares are "free and clear of any encumbrances, security interests or liens of any kind."

49.     However, Defendant IRS asserts that Defendant Holdner's shares are encumbered by a federal tax lien in the amount of at least $235,683.22, plus penalties, interest, and costs (the "**Tax Lien**").

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

50.     Defendant IRS filed a copy of the Tax Lien with the Oregon Secretary of State, as Lien # 89176216. (A copy is attached as Exhibit 2 of Exhibit B, described below.)

51.     Defendant IRS contends that the Tax Lien creates an encumbrance on Defendant Holdner's shares, and that IRS is entitled to the Holdner Payment until the debt secured by the Tax Lien is paid off in full.

52.     Defendant Holdner contends that the Tax Lien does not create an encumbrance on his shares of the Debtor's stock, and that it is not valid. Defendant Holdner contends that the validity of the lien is currently the subject of litigation in the United States Court of Appeals for the Ninth Circuit.

53.     The Plan Agent's counsel has reviewed all of the case dockets and opinions referenced by Mr. Holdner that relate to the Tax Lien. It appears there is no basis for Mr. Holdner's contentions. The Plan Agent's counsel provided a summary analysis of the Tax Lien litigation, along with a copy of the Tax Lien filing and the key rulings, to Mr. Holdner. A true and correct copy of this Tax Lien letter analysis, with all exhibits, is attached as **Exhibit B**.

54.     Notwithstanding the Plan Agent's analysis, defendant Holdner continues to contend that the Tax Lien is not valid or enforceable, and he demands payment from the Plan Agent in full.

55.     The Plan Agent has requested from the IRS, and from Holdner, a payoff or other statement regarding the amount of the Tax Lien. Neither has provided the requested information.

56.     The Tax Lien appears, at least on its face, to be a valid and enforceable lien on Holdner's shares, and now the proceeds thereof (the Holdner Payment).

57.     Under the circumstances, if the Plan Agent were to distribute the Holdner Payment among the Defendants (assuming a payoff or writ of garnishment was provided to the Plan Agent), the Plan Agent would risk litigation in multiple venues, potentially with inconsistent results.

/ / /

/ / /

/ / /

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

## V. **Dispute Over Right to Holdner Stock Certificates**

58.     Holdner has elected to sell his shares, pursuant to Section 7.2 of the Plan.

59.     However, Holdner refuses to turn over his original stock certificates to the Plan Agent until he is paid in full ($945,700) for his shares.

60.     Kreitzberg has paid to the Plan Agent the full amount owed in connection with Holdner's shares (in the form of the Holdner Payment), pursuant to Section 7.2 of the Plan.

61.     Kreitzberg has requested the Plan Agent provide him with the original stock certificates for Holdner's Opt-In Shares, pursuant to the Plan Agent's obligations under the Plan.

62.     The Plan Agent believes that, having performed his obligations under the Plan, Kreitzberg is entitled to the original stock certificates for Holdner's Opt-In Shares.

63.     Defendant IRS may assert an interest in the stock certificates for Holdner's Opt-In Shares in connection with the Tax Lien, to the extent the Tax Lien is not paid from the Holdner Payment.

64.     These circumstances put the Plan Agent at risk of litigation in multiple venues, potentially with inconsistent results.

### FIRST CLAIM FOR RELIEF
### (Interpleader)
### (Holdner Payment)

65.     The Plan Agent restates and incorporates the allegations of paragraphs 1 through 64 above.

66.     The Plan Agent, and the Bankruptcy Estate itself, makes no claim to the Holdner Payment.

67.     However, because multiple parties claim a right to the Holdner Payment, the Plan Agent cannot determine which party or parties are entitled to the Holdner Payment, and in what amount. Unless the Holdner Payment is disbursed by the Plan Agent using this Interpleader action, the Effective Date cannot be triggered and the creditors cannot be paid.

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

68.     Therefore, the Plan Agent hereby interpleads the Holdner Payment. The Plan Agent will move separately, pursuant to Fed. R. Bankr. P. 7067 and LBR 7067-1, to deposit the $945,700 into the Court's registry.

## SECOND CLAIM FOR RELIEF
### (Interpleader)
### (Original Holdner Stock Certificates)

69.     The Plan Agent restates and incorporates the allegations of paragraphs 1 through 67 above.

70.     Although the Bankruptcy Estate may possess an equitable or other interest in both Holdner's Election to Sell (with the photocopied stock certificates) tendered by Holdner, and the original stock certificates that Holdner now refuses to turn over, the Bankruptcy Estate makes no claim to any interest in the Holdner Opt-In Shares or in the original stock certificates representing those shares. The shares have been paid for by Defendant Kreitzberg.

71.     Multiple parties claim a right to the original stock certificates representing the Holdner Opt-In Shares, and Holdner refuses to turn them over in light of the dispute over the Holdner Payment. Therefore, unless the Bankruptcy Estate's rights to the Holdner Opt-In Shares are hereby transferred by the Plan Agent using this Interpleader action, the Effective Date cannot be triggered and the creditors cannot be paid.

72.     Therefore, the Plan Agent hereby interpleads all rights and interests in the original stock certificates representing Holdner's Opt-In Shares.

**WHEREFORE**, the Plan Agent / Interpleader requests:

a.     That the Defendants in this Interpleader and each of them be required to interplead and litigate among themselves their rights and claims to the Holdner Payment;

b.     That the Defendants in this Interpleader and each of them be required to interplead and litigate among themselves their rights and claims to the original stock certificates representing Holdner's Opt-In Shares;

c.     The Court determine and enter an Order setting forth the proper recipient or recipients of the Holdner Payment;

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

d.      The Court determine and enter an Order setting forth the proper recipient or recipients of the original stock certificates representing Holdner's Opt-In Shares;

e.      That, to the extent necessary, the Court enter an Order requiring Holdner to turn over the original stock certificates representing his Opt-In Shares to any party or parties entitled to possession of such original stock certificates.

f.      That the Plan Agent be held harmless and discharged from all liability in connection with this Interpleader and the disbursement of the Holdner Payment and the original stock certificates of Holdner's Opt-In Shares;

g.      That each Defendant be enjoined from instituting any action or taking any other steps against the Plan Agent or the Bankruptcy Estate for recovery of the Holdner Payment or the original stock certificates representing Holdner's Opt-In Shares, except as provided in this Action; and

h.      For such other and further relief the Court deems appropriate.

DATED this 10th day of February 2017.

LEONARD LAW GROUP LLC

By: /s/ Justin D. Leonard
    Justin D. Leonard, OSB No. 033736
       Direct:  971.634.0192
       Email:  jleonard@LLG-LLC.com
    Timothy A. Solomon, OSB No. 072573
       Direct:  971.634.0194
       Email:  tsolomon@LLG-LLC.com
    Counsel for Interpleader / Plan Agent

LEONARD LAW GROUP LLC
1 SW Columbia, Ste. 1010
Portland, Oregon 97258
leonard-law.com

## Election to Sell Shares

1.  Contact Information:

    Name: _William F. Holdner_

    Address: _975 SE Sandy Blvd_

    _Portland, Oregon 97214_

2.  Number of Shares to be Sold: _135,100_

    *Note*: If you wish to sell your Shares to the Purchaser, you must sell *all* of your Shares.

3.  Stock certificate number(s): _See listing attached_

    *Note*: please attach a photocopy of the certificate(s). If you do not have the original certificate, please execute the attached Affidavit of Loss of Stock Certificate and Indemnity Agreement and return it with this form.

4.  Representations and Warranties of Seller:

    Seller hereby warrants and represents that the Seller (a) is not a party to any agreements that create rights or obligations in the Shares relating to any third party including voting or stockholder agreements, (b) is the lawful owner of the Shares, and (c) has full power and authority to sell and transfer the Shares to the Purchaser.

    Seller hereby further warrants and represents that the Shares are either: [*choose one*]
    _✓_ - (a) free and clear of any encumbrances, security interests or liens of any kind, *or*
    _____ - (b) encumbered by encumbrances, security interests or liens of any kind in the amount(s) of $_____ in favor of _____ (attach documentation of any encumbrances).

    Seller hereby further warrants and represents that Seller has reviewed, and has been given the opportunity to have his/her/its attorney, accountant and/or financial adviser review, the Second Amended Disclosure Statement Regarding Trustee's Plan of Reorganization Dated October 5, 2016 and the Trustee's First Amended Plan of Reorganization Dated September 30, 2016.

5.  Signature: _____    Date: _2·2·17_

**If you do not provide the information required above by the Response Deadline, you will be deemed to have elected to retain your Shares.**

**EXHIBIT A**
**1 of 19**

```
WILLIAM F. HOLDNER
CERTIFICATE #                          AMOUNT OF SHARES

1003                                         16,667
1016                                         66,667
10027                                        36,666
10037                                           500
10036                                           500
10035                                           500
10034                                           500
10033                                           500
10032                                           500
10108                                         1,000
10315                                           500
11432                                           500
13631                                         1,000
13875                                         6,825
13917                                           500
13941                                         1,575
13943                                           200
                        Total               135,100
```



This security has not been registered for public sale with the Securities Exchange Commission under the Securities Act of 1933, nor has it been registered for public sale under the Oregon Securities Law or any other securities law.

INCORPORATED UNDER THE LAWS OF OREGON

SHARES 16,667

NUMBER 1003

DATA SYSTEMS, INC.

**This Certifies That** WILLIAM F. HOLDNER

is the owner of Sixteen Thousand, Six Hundred Shares of the Capital Stock of

Data Systems, Inc.

Sixty-Seven

transferable only on the books of this Corporation in person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this 11th day of July A.D. 1968.

President

Secretary

no par value

SHARES

INCORPORATED UNDER THE LAWS OF OREGON

SHARES
66,667

NUMBER
1016

DATA SYSTEMS, INC.

**This Certifies that** WILLIAM F. HOLDNER

*is the owner of* Sixty-Six Thousand, Six Hundred *Shares of the Capital Stock of*
Sixty-Seven DATA SYSTEMS, INC.

*transferable only on the books of this Corporation in person or by Attorney
upon surrender of this Certificate properly endorsed.*

In Witness Whereof, *the said Corporation has caused this Certificate to be signed
by its duly authorized officers and its Corporate Seal to be hereunto affixed
this* 14th *day of* August *A.D.* 1968

_____ Secretary

_____ President

no par value

SHARES    EACH

This security has not been registered for public sale with the Securities Exchange
Commission under the Securities Act of 1933, nor has it been registered for public sale
under the Oregon Securities Law or any other securities law.

EXHIBIT A
4 of 19

Case 17-03023-tmb    Doc 1    Filed 02/10/17



**DATA SYSTEMS, INC.**

NUMBER 10027

SHARES **36,666**

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

*This Certifies that* *************** WILLIAM F. HOLDNER ******************* IS THE

OWNER OF *************** THIRTY-SIX THOUSAND SIX HUNDRED SIXTY-SIX **** SHARES
OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE
HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY
AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ____2ND____ DAY OF ____DECEMBER____, 19 70

_____ President

_____ Assistant Secretary

DATA SYSTEMS INC. CORPORATE SEAL OREGON



## DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

NUMBER 10037

SHARES ***500***

*This Certifies that* ************ WILLIAM F. HOLDNER ********************** IS THE

OWNER OF ************************** FIVE HUNDRED ********************** SHARES
OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE
HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY
AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ___2ND___ DAY OF ___DECEMBER___ , 19 70

President

Assistant Secretary

DATA SYSTEMS, INC. CORPORATE SEAL OREGON



# DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

*This Certifies that* *************** WILLIAM F. HOLDNER ******************* IS THE

OWNER OF ****************************** FIVE HUNDRED ********************* SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE
HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY
AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ____2ND____ DAY OF ____DECEMBER____, 19 70

President

Assistant Secretary

NUMBER 10036

SHARES ***500***



DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

NUMBER 10035

SHARES ***500***

This Certifies that ***************** WILLIAM F. HOLDNER ****************************** IS THE

OWNER OF ***************************** FIVE HUNDRED ****************************** SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE
HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

In Witness Whereof, THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY
AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS 2ND DAY OF DECEMBER , 19 70

President

Assistant Secretary

DATA SYSTEMS, INC. CORPORATE SEAL OREGON



# DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

*This Certifies that* ************** WILLIAM F. HOLDNER ********************** IS THE

OWNER OF ****************************** FIVE HUNDRED ********************** SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE
HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY
AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ___2ND___ DAY OF ___DECEMBER___ , 19 _70_

_____ President

_____ Assistant Secretary

***500***

10034

**EXHIBIT A**

**9 of 19**

Case 17-03023-tmb    Doc 1    Filed 02/10/17



# DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

SHARES ***500***

NUMBER 10033

*This Certifies that* ************* WILLIAM F. HOLDNER ****************** IS THE

OWNER OF ************************* FIVE HUNDRED ****************** SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ___2ND___ DAY OF ___DECEMBER___, 19_70_

President

Assistant Secretary



# DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

NUMBER 10032

***500***

SHARES

*This Certifies that* ************ WILLIAM F. HOLDNER ************************** IS THE

OWNER OF ************************************** FIVE HUNDRED ********************** SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE

HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY

AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ___2ND___ DAY OF ___DECEMBER___ , 19 _70_

_____ President

_____ Assistant Secretary

DATA SYSTEMS, INC. CORPORATE SEAL OREGON



# DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

SHARES **1,000**

NUMBER 10108

*This Certifies that* *****WILLIAM F. HOLDNER*****

IS THE

OWNER OF *****ONE THOUSAND***** SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS 31st DAY OF DECEMBER , 19 70

President

Assitant Secretary

DATA SYSTEMS, INC. CORPORATE SEAL OREGON

This security has not been registered for public sale with the Securities Exchange Commission under the Securities Act of 1933, nor has it been registered for public sale under the Oregon Securities Law or any other securities law.

© 1965 B4-B



## DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

NUMBER 10315

SHARES ***500***

*This Certifies that* ************ WILLIAM F. HOLDNER ************ IS THE

OWNER OF ************************************** FIVE HUNDRED ************************************** SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE
HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY
AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS 18th DAY OF JUNE , 19 71

President

Assistant Secretary

DATA SYSTEMS, INC. CORPORATE SEAL OREGON



**DATA SYSTEMS, INC.**

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

**500**

SHARES

NUMBER 11432

*This Certifies that* *****WILLIAM F. HOLDNER*****

IS THE OWNER OF *****Five Hundred***** SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS _2nd._ DAY OF _December_, 19 _74_

_____ President

_____ Assistant Secretary

DATA SYSTEMS, INC. CORPORATE SEAL OREGON



DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

NUMBER Nᵒ 13631

SHARES ***1,000***

This Certifies that *****WILLIAM F. HOLDNER*****

IS THE OWNER OF *****One Thousand*****  SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

In Witness Whereof, THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS   1st   DAY OF   May   , 19  90

President

Secretary

Asst.

DATA SYSTEMS INC. CORPORATE SEAL OREGON



# DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

NUMBER No. 13875

SHARES ***6,825***

*This Certifies that* \_\_\_\_\_***WILLIAM F. HOLDNER***\_\_\_\_\_ IS THE

OWNER OF \_\_\_\_\_***Six Thousand Eight Hundred Twenty Five***\_\_\_\_\_ SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS \_\_\_25th\_\_\_ DAY OF \_\_\_March\_\_\_, 19 94

President

Secretary



## DATA SYSTEMS, INC.

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

NUMBER
Nº 13917

SHARES
***500***

*This Certifies that*

*****WILLIAM F. HOLDNER*****

IS THE

OWNER OF      *****Five Hundred*****      SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ___27th___ DAY OF ___September___ , 19 _94_

_____ President

_____ Secretary

DATA SYSTEMS, INC.
CORPORATE SEAL
OREGON



**DATA SYSTEMS, INC.**

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

IS THE

CERTIFICATE No. 13941

***1,575***

*This Certifies that*     *****WILLIAM F. HOLDNER*****

OWNER OF     *****One Thousand Five Hundred Seventy Five***** SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ___16th___ DAY OF ___May___, 19 __95__

President

Secretary

DATA SYSTEMS, INC. * CORPORATE * SEAL * OREGON

EXHIBIT A

18 of 19

Case 17-03023-tmb    Doc 1    Filed 02/10/17



**DATA SYSTEMS, INC.**

ORGANIZED UNDER THE LAWS OF THE STATE OF OREGON

SHARES ***200***

No. 13943

*This Certifies that* *****WILLIAM F. HOLDNER*****

OWNER OF *****Two Hundred*****   SHARES

OF NO PAR VALUE COMMON STOCK, TRANSFERABLE ONLY ON THE BOOKS OF THE CORPORATION BY THE HOLDER THEREOF IN PERSON OR BY ATTORNEY UPON SURRENDER OF THIS CERTIFICATE PROPERLY ENDORSED.

IS THE

*In Witness Whereof,* THE SAID CORPORATION HAS CAUSED THIS CERTIFICATE TO BE SIGNED BY ITS DULY AUTHORIZED OFFICERS AND ITS CORPORATE SEAL TO BE HEREUNTO AFFIXED

THIS ___18th___ DAY OF ___May___, 19 __95__

President

Secretary



1 SW Columbia, Ste. 1010
Portland, OR 97258

P 971 634 0190
F 971 634 0250

leonard-law.com

February 3, 2017

Justin D. Leonard
Admitted in Oregon, Idaho,
and Washington

jleonard@LLG-LLC.com
D 971 634 0192

**VIA EMAIL (jane@holdnerbaum.com)**

William Holdner
975 SE Sandy Blvd.
Portland, OR 97214

Re:   *In re Data Systems, Inc.,* U.S. Bankruptcy Court for the District of Oregon,
       Case No. 16-30477-rld11

       **Your Election to Sell Shares / Our IRS Tax Lien Analysis**

Dear Mr. Holdner:

As you know, this office represents the plan agent Amy Mitchell (the "**Plan Agent**") in the above-referenced case.

Pursuant to Section 7.2 of the confirmed First Amended Plan of Reorganization Dated September 30, 2016 (Docket No. 155) (the "**Plan**"), shareholders of Data Systems, Inc. ("**DSI**") have a right to sell their shares to Richard Kreitzberg at a price of $7.00 per share. On or about December 29, 2016, the Plan Agent caused to be sent to you and all other shareholders of record a Court-approved Notice of Offer to Purchase Shares of Data Systems, Inc. (Docket No. 232) (the "**Notice**"), notifying you of your right to elect to sell your shares of DSI pursuant to the Plan. Included with the Notice was a form entitled "**Election to Sell Shares**," to be filled out by shareholders who wished to sell their shares. Among other things, the Election to Sell Shares requires shareholders who wish to sell their shares either (1) to warrant and represent that they may sell their shares free and clear of any encumbrances, security interests or liens of any kind, or (2) to disclose any encumbrances against their shares, the amount of such encumbrances, and the identity of the party asserting an encumbrance.

On February 2, 2017, you delivered a completed Election to Sell Shares to our office. In that document, you indicated that you wish to sell 135,100 shares of DSI stock to Mr. Kreitzberg for $7.00 per share. You further warranted and represented, by checking Box 4(a), that the shares you wish to sell are "free and clear of any encumbrances, security interests or liens of any kind."

We do not dispute that you are eligible, pursuant to Section 7.2 of the Plan, to sell your shares of DSI. Your form was completed and submitted within the time period. Therefore, your Election to Sell is effective, and based on the Election to Sell we have issued a request for payment from Kreitzberg to satisfy the purchase of all Opt-In Shares as defined in the Plan ($2,044,413 in exchange for a certificate representing the 292,059 Opt-In Shares shares).

However, it has come to our attention that your shares may be encumbered by a federal tax lien in the amount of at least $235,683.22. A copy of the Notice of Federal Tax Lien recorded in Multnomah County, Oregon (the "**Tax Lien**"), is attached as **Exhibit 1**. I mentioned the Tax Lien



to you when you delivered your Election to Sell Shares to our office. At that time, and in your phone calls today, you stated that the Tax Lien does not create an encumbrance on your shares of DSI because the validity of the Tax Lien is currently the subject of litigation in the United States Court of Appeals for the Ninth Circuit.

We have reviewed the cases you referenced in your phone calls. As we understand it, the Tax Lien appears to relate to taxes owed for the years 2004 to 2006. You appear to have challenged the obligations in United States Tax Court. In August 2010, the Tax Court ruled against you and held that you are liable for the taxes. A copy of the Tax Court's opinion is attached as **Exhibit 2**.

You appear to have appealed the Tax Court's ruling to the Ninth Circuit Court of Appeals, but that court ruled against you and affirmed the Tax Court in an opinion dated October 12, 2012, a copy of which is attached as **Exhibit 3**.

It appears that sometime after the Ninth Circuit's 2012 ruling, the Tax Court issued a summary judgment in favor of the Internal Revenue Service authorizing it to collect your federal income tax liabilities for 2004 to 2006. You appear to have appealed that ruling to the Ninth Circuit, which once again ruled against you and affirmed the Tax Court in an opinion dated December 1, 2015, a copy of which is attached as **Exhibit 4**.

In 2016, you filed a declaratory judgment action in the United States District Court for the District of Oregon, seeking to have the 2004 to 2006 assessments declared "invalid." The District Court ruled against you in an opinion dated November 23, 2016, a copy of which is attached as **Exhibit 5**, along with the Court's Docket as **Exhibit 6**. In December 2016, you appealed that ruling to the Ninth Circuit Court of Appeals, where it is pending. That case overview is attached as **Exhibit 7**.

None of these rulings (or other orders appearing on the dockets in these cases) stayed or otherwise impacted the effectiveness of the Tax Lien. There is no ruling that the Tax Lien is invalid or otherwise unenforceable in whole or in part. As a result, we believe your shares of DSI are encumbered by the Tax Lien, which must be satisfied from the sale proceeds.

Please complete IRS Form 8821 (attached) so that we can obtain an official payoff from the IRS, or otherwise provide us an official current payoff. Unless we receive a payoff with the current amount of the Tax Lien to be withheld or other instructions from the IRS, we will likely have no choice but to request guidance from the Bankruptcy Court (most likely by impleading the funds to the Court).

Sincerely,

Justin D. Leonard

Enclosures
cc:    Amy Mitchell, Plan Agent (via email)
       Tim Solomon, co-counsel (via email)

**EXHIBIT B**
**2 of 32**

**Form 668 (Y)(c)**
(Rev. February 2004)

3593

Department of the Treasur

**Notice of Fede**

Lien#: 89176216

IRS

89176216_5768282

Area:
SMALL BUSINESS/SELF EMPLOYED AREA #6
Lien Unit Phone: (800) 913-6050

Serial Numbe.

861985212

Lien#: 89176216

... by Recording Office

As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.

Name of Taxpayer WILLIAM F HOLDNER

Residence      975 SE SANDY BLVD
PORTLAND, OR 97214-1308

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 12/31/2004 | XXX-XX-0602 | 07/11/2005 | 08/10/2015 | |
| 1040 | 12/31/2004 | XXX-XX-0602 | 06/05/2006 | 07/05/2016 | |
| 1040 | 12/31/2004 | XXX-XX-0602 | 07/01/2011 | 07/31/2021 | 56870.47 |
| 1040 | 12/31/2005 | XXX-XX-0602 | 07/10/2006 | 08/09/2016 | |
| 1040 | 12/31/2005 | XXX-XX-0602 | 07/01/2011 | 07/31/2021 | 106241.20 |
| 1040 | 12/31/2006 | XXX-XX-0602 | 07/02/2007 | 08/01/2017 | |
| 1040 | 12/31/2006 | XXX-XX-0602 | 07/01/2011 | 07/31/2021 | 72571.55 |

Place of Filing

UCC DIVISION, ROOM 142
SECRETARY OF STATE
SALEM, OR 97310

Total $     235683.22

This notice was prepared and signed at     SEATTLE, WA    , on this,

the   17th   day of   April  , 2012 .

**EXHIBIT B**

Signature     for JOHN HEGI

Title
REVENUE OFFICER
(360) 699-1061

**(NOTE:** Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax lien Rev. Rul. 71-466, 1971 - 2 C.B. 409)

Form 668(Y)(c) (Rev. 2-2004)
CAT. NO 60025X

15

**T.C. Memo. 2010-175**

**RANDAL W. HOLDNER, Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**WILLIAM F. HOLDNER, Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

Nos. 10367-08, 10375-08

**United States Tax Court.**

Filed August 4, 2010.

Randal W. Holdner and **William F. Holdner**, pro sese.

Kelley A. Blaine, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge.

Petitioners, father and son, have run a farming operation (Holdner Farms) since 1977. Each petitioner effectively reported one-half of Holdner Farms' gross income for 2004, 2005, and 2006 on Schedules F, Profit or Loss From Farming, *2 and Schedules D, Capital Gains and Losses, of their respective Federal income tax returns for those years, but they did not split the expenses equally or file Federal partnership returns. Petitioner **William F. Holdner** (William Holdner) deducted most of Holdner Farms' expenses on Schedules F attached to his 2004-2006 returns.

2

In separate notices of deficiency issued to petitioners, respondent determined that (1) Holdner Farms was a partnership (or a joint venture taxed as a partnership) for Federal income tax purposes in 2004-2006, (2) petitioners were equal partners in the partnership, and (3) William Holdner was liable for the section 6662[1] accuracy-related penalty for 2004-2006. To protect against a whipsaw situation, respondent allocated 100 percent of Holdner Farms' income to each petitioner, disallowed all expenses,[2] and determined the following deficiencies and penalties:

3    *3

|  |  | Deficiency | | | Sec. 6662 Penalty | |
|  | Year | Randal W. Holdner | William F. Holdner | | Randal W. Holdner | William F. Holdner |
|---|---|---|---|---|---|---|
|  | 2004 | $192,7311 | $264,016 | | – – | $52,803 |
|  | 2005 | 136,443 | 215,211 | | – – | 43,042 |
|  | 2006 | 197,999 | 296,554 | | – – | 59,311 |

1 All monetary amounts have been rounded to the nearest dollar.

Petitioners timely petitioned this Court to review respondent's determinations. Respondent moved to consolidate petitioners' cases for trial, briefing, and opinion, and we granted respondent's motion. The issues for decision are: (1) Whether petitioners' Holdner Farms activity was a partnership (or a joint venture taxed as a partnership) for Federal income tax purposes during 2004-2006; (2) if so, whether partnership expenses must be allocated in accordance with partnership income; i.e., 50 percent to each petitioner; and (3) whether William Holdner is liable for the section 6662 accuracy-related penalty for 2004-2006.

EXHIBIT B
4 of 32
EXHIBIT 2
1 of 14

## FINDINGS OF FACT

Some of the facts have been stipulated. We incorporate the stipulated facts into our findings by this reference. Petitioners resided in Oregon when their petitions were filed. William Holdner, a certified public accountant, is the father of petitioner Randal W. Holdner (Randal Holdner).

4

*4 **I. Background: 1968-77**

In 1968 or 1969 William Holdner purchased two cows, a bull, and a horse (collectively, livestock). His daughter and his son, Randal Holdner, bred the cattle and showed the livestock at 4-H and Future Farmers of America events, and the children's livestock activity expanded each year.

The family kept the livestock at the Home Place, a 3.36-acre property in Scappoose, Oregon, that was improved by petitioners' home,[3] a barn, and an equipment shed and included a pasture. The Home Place was titled in William Holdner's name. The record does not disclose when William Holdner purchased the Home Place or how much he paid for the property.

In 1972 William Holdner purchased the Chapman property, a 17-acre parcel in Scappoose, Oregon, consisting of a testing station and a pasture, for $17,000. William Holdner later purchased a mobile home for the Chapman property for around $10,000. In 1974 William Holdner purchased the Dutch Canyon property, a 100-acre parcel in Scappoose, Oregon, consisting of a barn, a cattle processing facility, a pollution control system, and a pasture, for $100,000. The

5    Chapman property and the Dutch Canyon property were titled in William Holdner's name. For *5 convenience, we shall refer to the Home Place, the Chapman property, and the Dutch Canyon property collectively as the separately owned properties.

## II. Holdner Farms' Formation: 1977

In 1977 Randal Holdner graduated from high school. He showed little interest in college, so his father offered him a deal––in lieu of paying for a college education, William Holdner would invest in a farming business for him. Specifically, William Holdner proposed that Randal Holdner manage the day-to-day farming activity on the separately owned properties in exchange for a share of the profits from cattle sales. Randal Holdner accepted his father's offer. Petitioners did not commit their agreement to writing.

Under their informal oral agreement, each petitioner had certain duties and responsibilities with respect to the farming operation known as Holdner Farms. Randal Holdner was responsible for managing the farm, and his duties included feeding the cattle, maintaining farm equipment, and tending to sick animals. William Holdner was primarily responsible for Holdner Farms' financial affairs, and his duties included arranging cattle sales, making payments to suppliers, and obtaining financing to purchase new farm properties. William Holdner also agreed, at least initially, to contribute money

6    to the farm, though it is *6 unclear how much money he actually contributed or whether he expected to be repaid.[4]

Petitioners also agreed to certain financial terms. They agreed that Randal Holdner would be entitled to one-half of Holdner Farms' gross proceeds from cattle sales and that Randal Holdner would have an equity interest in Holdner Farms, though the precise nature of that interest is unclear. The record does not contain any credible evidence that petitioners discussed the allocation of other items of income and expense when the Holdner Farms activity began, nor is there any credible evidence that petitioners reached any agreement regarding the allocation of such items in the early years of Holdner Farms.

When the Holdner Farms activity began, William Holdner did not transfer an interest in the separately owned properties to his son, and petitioners took no steps to clarify their respective interest in the farm equipment or the

7    livestock. However, petitioners had an understanding that all property used in the Holdner Farms enterprise, including the separately owned properties, would be devised to Randal Holdner upon William *7 Holdner's death,[5]

**EXHIBIT B**
**5 of 32**
**EXHIBIT 2**
**2 of 14**

assure that Holdner Farms would remain a viable business upon William Holdner's death.[6]

## III. Holdner Farms' Expansion: 1977-2004

8
William Holdner believed the key to developing a successful farming operation was to acquire income-producing property under *8 land sales contracts.[7] That way the properties were available to generate income that could be used to repay the loans. Between 1984 and 1992 petitioners jointly purchased several properties under land sales contracts.[8]

In 1984 petitioners purchased the Sattler property, a 178.96-acre property in Scappoose, Oregon, consisting of timberland and pasture for $175,000.[9] Petitioners completed payments under the contract sometime before 2000, and on October 9, 2006, they received a warranty deed from the seller's estate. Petitioners also jointly leased 90 acres of pasture adjacent to the Sattler property during the years at issue.

9
*9 In 1988 or 1989 petitioners purchased the Ernest property, a 54.24-acre farm in Scappoose, Oregon, for $265,000. The Ernest property consists of croplands and pasture and includes land that petitioners lease to a nursery.[10] The property is improved by two houses,[11] two barns, and a cattle processing facility. Petitioners built the two barns using Holdner Farms' profits. Around the same time petitioners purchased the Johnson Landing Road property, a 115.32-acre property that is zoned for farm use. As mentioned above, see supra note 8, petitioners refer to the Ernest and Johnson Landing Road properties as a single property.

In 1989 petitioners purchased the Dike Road property, a 33.22-acre farm property in Scappoose, Oregon. In 1992 petitioners purchased an adjacent 7-acre parcel known as the Hayes property, which includes a house and a pasture. Finally, between 1997 and 2006, petitioners jointly leased 543 acres of pastureland in Vancouver, Washington, across the Columbia River from Oregon.

10
With the exception of the jointly leased properties, petitioners purchased all of the above-described properties jointly under land sales contracts, with title passing only after the purchase prices were fully paid. Petitioners generated funds *10 to make payments under the land sales contracts by renting out the properties or parts thereof. All of the aforementioned land sales contracts were paid in full before 2004. For convenience we shall refer to the properties petitioners purchased or leased jointly as the jointly owned properties.

Petitioners hold title to the jointly owned properties equally as tenants in common. Although a tenancy in common typically does not include the right of survivorship,[12] petitioners had an understanding that Randal Holdner would inherit the farm, including the jointly owned properties, upon his father's death.[13]

## IV. Holdner Farms' Operations: 2004-2006

11
By 2004 Holdner Farms had grown into a profitable cattle farming operation. Petitioners owned as many as 2,000 head of cattle at any given time, and they used all of the separately owned properties and all of the jointly owned properties in the cattle farming business. Petitioners' total gross revenue from cattle sales in 2004-2006 was nearly $1 million. In addition, *11 Holdner Farms had developed two additional sources of income— rental income from leasing parts of the jointly owned properties (totaling $283,800 for 2004-2006) and income from logging the Sattler property (totaling $869,116 for 2004-2006).[14]

Throughout 2004-2006 Randal Holdner managed Holdner Farms' day-to-day operations, often working 16-18 hour days, while William Holdner was primarily responsible for Holdner Farms' finances and accounting. William Holdner devoted approximately 50 percent of his professional time to Holdner Farms in 2004-2006, and Randal Holdner devoted all of his worktime to Holdner Farms. During 2004-2006 petitioners shared equally in Holdner Farms' gross income from cattle sales. At some point before 2004 petitioners also agreed to share equally in Holdner Farms' gross rental income and gross income from timber sales, and during 2004-2006 they divided these additional sources of income equally.

EXHIBIT B
6 of 32
EXHIBIT 2
3 of 14

Although petitioners never committed their revised agreement to writing, petitioners took other steps in years preceding 2004 to formalize their business arrangement. First, petitioners created a separate bank account for Holdner Farms (the Holdner Farms account), which was in existence throughout 2004-2006. Each petitioner was an authorized signatory on the Holdner Farms account and could sign checks and withdraw funds from the *12 account. Petitioners deposited all proceeds from cattle sales, rental activity, and timber sales into the Holdner Farms account, and they used the Holdner Farms account to pay most farm expenses. Petitioners also took draws from the account.

Second, petitioners purchased an insurance policy for Holdner Farms. When the policy required a rewrite in 2003, petitioners' insurance broker, Raymond Schumacher, who testified at trial, recommended that petitioners register Holdner Farms as a partnership for insurance purposes. Petitioners accepted Schumacher's suggestion and purchased a commercial umbrella insurance policy. The policy's declarations page describes the form of business insured as a partnership.

Finally, on January 23, 2003, petitioners registered Holdner Farms as a partnership with the State of Oregon. Petitioners renewed the registration on December 14, 2004, and again on December 26, 2006.

## V. Petitioners' 2004-2006 Federal Income Tax Returns

In addition to his involvement with Holdner Farms, William Holdner maintained an active accounting practice in 2004-2006 which he conducted as a partnership with several other partners. On his Federal income tax returns for 2004, 2005, and 2006, William Holdner reported on Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., income from his accounting partnership of $264,516, $232,156, and $263,423, respectively.

*13 William Holdner prepared his and his son's Federal income tax returns for 2004-2006. For 2004-2006 petitioners reported Holdner Farms' income and expenses from cattle sales and rental activity on Schedules F of their income tax returns, and they reported Holdner Farms' income and expenses from timber sales on Schedules D of the returns. Each petitioner effectively reported one-half of Holdner Farms' gross income.[15] However, William Holdner deducted most of Holdner Farms' expenses in 2004-2006 on his personal income tax returns for those years. As a result, William Holdner's income tax returns for 2004-2006 claimed net losses from his involvement in Holdner Farms, as illustrated by the following table:

|  | 2004 | | 2005 | | 2006 | |
|---|---|---|---|---|---|---|
|  | Randal Holdner | William Holdner | Randal Holdner | William Holdner | Randal Holdner | William Holdner |
| Cattle income | $138,966 | $138,966 | $91,695 | $91,695 | $250,405 | $250,405 |
| Rental income | 47,175 | 47,175 | 53,8751 | 53,875 | 40,850 | 40,8501 |
| Timber sales | 237,966 | 237,966 | 196,592 | 196,592 | - - | - - |
| Total income | 424,107 | 424,107 | 342,162 | 342,162 | 291,255 | 291,255 |
| Total expenses | 158,797 | 477,991 | 167,320 | 431,219 | 261,473 | 551,032 |
| Net gain (loss) | 265,310 | (53,884) | 174,842 | (89,057) | 29,782 | (259,777) |

1 Both petitioners testified that they divided income from cattle sales, rental income, and timber sales generated by Holdner Farms equally during the years at issue, and their testimony is generally consistent with their tax returns. However, William Holdner, who prepared the tax returns, would sometimes report 100 percent of certain income (such as rental income in 2005 and 2006) and then claim an offsetting deduction for the 50-percent share owed to Randal Holdner. Regardless of how the income was actually reported on the relevant returns, however, the net effect of petitioners' reporting positions is that all income from Holdner Farms was divided equally between them during

EXHIBIT B
7 of 32
EXHIBIT 2
4 of 14

```
the years at issue.  The above table reflects each petitioner's net share of
the gross income generated by cattle sales, rentals, and timber sales.
```

14    *14 In a few instances petitioners shared expenses in the same way they shared gains; i.e., 50-50. In most instances, however, William Holdner allocated Holdner Farms' expenses between himself and his son as he saw fit. Indeed, the allocation of Holdner Farms' expenses between petitioners did not bear any apparent relationship to petitioners' respective ownership interests in, or their respective levels of involvement with, Holdner Farms. In fact, the allocation of expenses made by William Holdner had no apparent rational basis[16] and appeared completely arbitrary, as illustrated by the following table showing William Holdner's allocation of depreciation, interest, and animal feed expenses during the years at issue:

```
*15 Depreciation Expense
```

| Year | Randal Holdner | | William Holdner | |
|------|------|------|------|------|
| | Amount | Percentage | Amount | Percentage |
| 2004 | $88,5661 | 89 | $11,357 | 11 |
| 2005 | 12,907 | 21 | 49,710 | 79 |
| 2006 | 133,576 | 53 | 119,584 | 47 |

```
Interest Expense
```

| Year | Randal Holdner | | William Holdner | |
|------|------|------|------|------|
| | Amount | Percentage | Amount | Percentage |
| 2004 | $1,900 | 8 | $23,005 | 92 |
| 2005 | 28,276 | 49 | 29,180 | 51 |
| 2006 | 20,134 | 50 | 20,134 | 50 |

```
Animal Feed Purchased
```

| Year | Randal Holdner | | William Holdner | |
|------|------|------|------|------|
| | Amount | Percentage | Amount | Percentage |
| 2004 | -0- | -0- | $224,932 | 100 |
| 2005 | -0- | -0- | 118,338 | 100 |
| 2006 | $54,144 | 29 | 134,433 | 71 |

```
1 All monetary amounts have been rounded to the nearest
dollar, and all percentages have been rounded to the nearest
whole number.
```

Following an examination of petitioners' returns for 2004-2006, respondent determined that Holdner Farms was a partnership for Federal income tax purposes and that petitioners were equal partners who must allocate partnership income and expenses accordingly. Respondent also determined that William Holdner was liable for the accuracy-related penalty under section 6662 for each of the years at issue. Petitioners timely filed petitions challenging respondent's determinations.

16    *16 **OPINION**

## I. Evidentiary Matters

**EXHIBIT B**
**8 of 32**
**EXHIBIT 2**
**5 of 14**

Respondent reserved objections to Exhibits 26-P through 33-P, which relate to respondent's examination of petitioners' 2004-2006 Federal income tax returns, on various grounds. Respondent objects to Exhibits 26-P through 31-P on the ground that they attempt to go behind the notice of deficiency. Respondent also objects to Exhibits 26-P, 27-P, 29-P, and 31-P through 33-P on the ground that they contain hearsay. Finally, respondent objects to Exhibit 32-P, an introductory letter from William Holdner to respondent's district counsel, on the ground that it is irrelevant.

A trial of a deficiency case in the Tax Court is a proceeding de novo. Our decision in a deficiency case is based on the record that is developed at trial, not on any previous record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974). Ordinarily, we do not go behind the notice of deficiency. Id. We have, however, recognized two limited exceptions to the general rule that we will not look behind the notice of deficiency. One is where there is substantial evidence of unconstitutional conduct by the Commissioner, and the other is in so-called naked assessment cases where the Commissioner introduces no evidence but rests on the presumption

17  of correctness and the taxpayer challenges the notice of deficiency *17 on the grounds that it is arbitrary. Graham v. Commissioner, 82 T.C. 299, 308-309 (1984), affd. 770 F.2d 381 (3d Cir. 1985); see also United States v. Janis, 428 U.S. 433, 441 (1976).

Neither exception is applicable in these cases. Petitioners have not alleged that respondent engaged in unconstitutional conduct with respect to the determinations, and respondent does not rely solely on the presumption of correctness. Petitioners have not convinced us that the exhibits in question are relevant or otherwise admissible, and we hold that they are not. Respondent's objections to Exhibits 26-P through 31-P are sustained.

With respect to respondent's objections to Exhibits 32-P and 33-P on grounds of relevance and hearsay, we note that proceedings in the Tax Court are conducted in accordance with the Federal Rules of Evidence. See sec. 7453; Rule 143(a). Rule 402 of the Federal Rules of Evidence provides that all relevant evidence is admissible unless otherwise provided, and all evidence that is not relevant is not admissible. Relevant evidence is any evidence that has any tendency to make any fact of consequence to the determination of the action more or less probable than it would be without the evidence. Fed. R. Evid. 401. However, even relevant evidence may be excluded if its probative value is substantially outweighed by, inter alia, "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. 403.

18  *18 Rule 801(c) of the Federal Rules of Evidence defines hearsay as any statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Hearsay is not admissible, except as provided by the Federal Rules of Evidence, by other rules prescribed by the Supreme Court pursuant to statutory authority, or by Act of Congress. Id. 802.

We agree with respondent that Exhibit 32-P, an introductory letter from William Holdner to respondent's district counsel, and Exhibit 33-P, a memorandum from William Holdner to the Appeals Office, are irrelevant. Moreover, Exhibit 33-P is an advocate's document containing arguments and citations made by William Holdner during the consideration of his case by the Appeals Office. To the extent Exhibit 33-P references financial information regarding Holdner Farms, most if not all of that information is already in evidence through other sources. Consequently, we sustain respondent's objections to Exhibits 32-P and 33-P.

## II. Burden of Proof

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer has the burden of proving that the determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In certain circumstances, if the taxpayer introduces credible evidence with respect to any factual issue relevant

19  to *19 ascertaining the taxpayer's liability for tax, section 7491(a) shifts the burden to the Commissioner but only if the taxpayer establishes that he has complied with the requirements of section 7491(a)(2). See Weaver v. Commissioner, 121 T.C. 273, 275 (2003); Baker v. Commissioner, 118 T.C. 452, 461 (2002), affd. 338 F.3d 789 (7th Cir. 2008).

EXHIBIT B
9 of 32
EXHIBIT 2
6 of 14

Petitioners have neither alleged that section 7491 applies nor established that they complied with the requirements of section 7491(a)(2) to substantiate items, to maintain required records, and to fully cooperate with respondent's

reasonable requests. Nevertheless, petitioners argue that respondent's determinations are not entitled to the presumption of correctness. Although petitioners' argument is not entirely clear, petitioners appear to object to the fact that respondent has taken inconsistent positions by allocating 100 percent of the income from petitioners' Holdner Farms activity to both petitioners and disallowing all deductions even though respondent concedes that petitioners' Holdner Farms' expenses were substantiated. Petitioners' argument is without merit.

It is well established that the Commissioner may take inconsistent positions in order to protect the public fisc and ensure against a potential whipsaw effect.[17] Fayeghi v. *20 Commissioner, 211 F.3d 504, 508 n.3 (9th Cir. 2000), affg. T.C. Memo. 1998-297; Centel Commcns. Co. v. Commissioner, 92 T.C. 612, 626 n.7 (1989) (citing Gerardo v. Commissioner, 552 F.2d 549, 555-556 (3d Cir. 1977), affg. in part and revg. in part T.C. Memo. 1975-341, and Estate of Goodall v. Commissioner, 391 F.2d 775, 782-783 (8th Cir. 1968), vacating T.C. Memo. 1965-154), affd. 920 F.2d 1335 (7th Cir. 1990); Doggett v. Commissioner, 66 T.C. 101, 103 (1976). In Estate of Goodall v. Commissioner, supra at 783, the Court of Appeals for the Eighth Circuit explained the rationale behind allowing the Commissioner to take inconsistent positions, stating:

> Inconsistency in determinations, when they are not made in bad faith, does not equate with an absence of the statutorily required determination, as the taxpayers suggest. Each taxpayer, even though there are several related ones, by the determination and notice made for him, knows the position the Commissioner is taking with respect to his tax situation. So long as the ultimate resolution of the issues is consistent for all, we see no legal wrong.

The same reasoning applies to this case. To prevent a potential whipsaw, respondent has taken inconsistent positions by allocating 100 percent of Holdner Farms' income to each petitioner and disallowing all expenses. Respondent acted in good faith, respondent's determinations clearly informed each petitioner of respondent's position with respect to each *21 petitioner's tax situation, and respondent seeks a consistent resolution for both petitioners; i.e., respondent concedes that only one-half of Holdner Farms' income should be allocated to each petitioner and that each petitioner should be allowed to deduct one-half of Holdner Farms' expenses. We therefore reject petitioners' argument, and we conclude that petitioners have the burden of proof with respect to disputed factual issues in this case.

## III. Petitioners' Holdner Farms Activity Was a Partnership (or a Joint Venture Taxed as a Partnership) for Federal Income Tax Purposes

The existence of a partnership for Federal income tax purposes is a question of Federal law and does not depend on whether an enterprise is recognized as a partnership under local law. Commissioner v. Culbertson, 337 U.S. 733, 741 (1949); Commissioner v. Tower, 327 U.S. 280, 287-288 (1946); see also Bergford v. Commissioner, 12 F.3d 166, 169 (9th Cir. 1993), affg. Alhouse v. Commissioner, T.C. Memo. 1991-652; Frazell v. Commissioner, 88 T.C. 1405, 1412 (1987). Section 7701(a)(2) defines a partnership as "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a trust or estate or a corporation". See also sec. 761(a) (defining a "partnership" the *22 same way).[18] A partnership is created for Federal income tax purposes when persons join together their property, labor, or skill for the purpose of carrying on a trade, profession, or business and there is a community of interest in the profits and losses. Commissioner v. Tower, supra at 286. In Commissioner v. Culbertson, supra at 742, the Supreme Court identified the task that a court must undertake in deciding whether a partnership exists for Federal tax purposes:

> The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * * but whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *

EXHIBIT B
10 of 32
EXHIBIT 2
7 of 14

See also Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964).

Generally, each partner in a partnership contributes property or services, or both. Commissioner v. Culbertson, supra at 741.[19] In addition, a valid partnership is generally formed *23 with a business purpose—to conduct an enterprise for profit. Madison Gas & Elec. Co. v. Commissioner, 633 F.2d 512, 514-517 (7th Cir. 1980), affg. 72 T.C. 521 (1979); Frazell v. Commissioner, supra at 1412; see also Cusick v. Commissioner, T.C. Memo. 1998-286; Estate of Winkler v. Commissioner, T.C. Memo. 1997-4. Mere coownership of property does not create a partnership for Federal income tax purposes, but coowners of property may become partners if they carry on a business activity for profit. Cusick v. Commissioner, supra; see also Estate of Winkler v. Commissioner, supra.

We conclude that petitioners' Holdner Farms activity was a partnership for Federal income tax purposes in 2004-2006 for several reasons. First, both petitioners contributed capital and labor to Holdner Farms. William Holdner contributed the separately owned properties in 1977, as well as his 50-percent share of the jointly owned properties as each was acquired, for use in a farming operation with his son. Although the record does not disclose whether Randal Holdner contributed any property to Holdner Farms in 1977, he contributed his 50-percent share of *24 the jointly owned properties to Holdner Farms as the properties were acquired. Moreover, both petitioners contributed labor to and performed services for Holdner Farms. Randal Holdner has spent the past three decades managing the farming enterprise full time, while William Holdner has spent considerable time managing Holdner Farms' business affairs part time.

Second, Holdner Farms has conducted a business activity for profit since 1977 when it was formed. From 1977 to the years at issue, Holdner Farms' farming operation grew steadily in scope and size and during 2004-2006 was active and profitable. Petitioners correctly note that mere coownership of property or a joint undertaking to share expenses alone is not sufficient to satisfy the business activity requirement. However, petitioners' Holdner Farms enterprise clearly was more than a mere coownership of property or a means to share expenses.

Third, petitioners shared Holdner Farms' gross income from cattle sales, timber sales, and rental income equally. Randal Holdner testified that he did not regard his share of the income as salary or wages, and William Holdner apparently agreed, as he did not prepare a Form W-2, Wage and Tax Statement, or a Form 1099-MISC, Miscellaneous Income, for his son for any of the years at issue. The record overwhelmingly demonstrates that Holdner Farms was a business activity for profit that was jointly *25 conducted by petitioners.[20]

An examination of the factors enumerated in Luna confirms our conclusion. In Luna v. Commissioner, supra at 1077-1078, we identified eight factors that are relevant to determining whether an enterprise is a partnership for Federal income tax purposes:

> [1] The agreement of the parties and their conduct in executing its terms; [2] the contributions, if any, which each party has made to the venture; [3] the parties' control over income and capital and the right of each to make withdrawals; [4] whether each party was a principal and coproprietor, sharing a mutual * * * obligation to share losses * * *; [5] whether business was conducted in the joint names of the parties; [6] whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; [7] whether separate books of account were maintained for the venture; and [8] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

Seven of the eight Luna factors support our conclusion that Holdner Farms was a partnership for Federal income tax purposes, and one factor neither supports nor weighs against it. First, petitioners agreed to split Holdner Farms' gross income from cattle sales, timber sales, and leasing activity, and they faithfully executed this agreement. Second, both petitioners *26 contributed capital and services to Holdner Farms. Third, petitioners had equal access to and control over the Holdner Farms account, and each petitioner had unlimited power to make withdrawals. Fourth, petitioners shared a mutual proprietary interest in Holdner Farms' profits, while petitioners' proprietary interest in Holdner Farms' losses, if any, is simply unclear. Fifth, the name "Holdner Farms", while ambiguous, suggested an enterprise that was not limited to one particular member of the Holdner family. Sixth, although petitioners did not file a Form 1065, U.S.

EXHIBIT B
11 of 32
EXHIBIT 2
8 of 14

Return of Partnership Income, on behalf of Holdner Farms, they represented to their insurer and to the State of Oregon that Holdner Farms was a partnership. Seventh, petitioners maintained a separate bank account for Holdner Farms, and William Holdner kept meticulous records for the enterprise. Finally, petitioners exercised mutual control over and responsibility for Holdner Farms. Although petitioners had different responsibilities, each played a crucial role in the enterprise, and each regarded himself as an owner. In summary, our examination of the Luna factors confirms our conclusion that Holdner Farms was a partnership for Federal income tax purposes.

Although petitioners' arguments are not entirely clear, petitioners appear to argue that their Holdner Farms' enterprise was a joint venture between two individual proprietorships; i.e., between William Holdner's individual proprietorship and Randal *27 Holdner's individual proprietorship. Petitioners call our attention to Bialock v. Commissioner, 35 T.C. 649 (1961), in which we held that a purported partnership between a taxpayer and his two minor children was not a valid partnership for Federal income tax purposes. Petitioners' argument is unavailing for several reasons.

First, the facts do not support petitioners' argument. There is no evidence, for example, that petitioners maintained separate bank accounts for their purportedly separate individual proprietorships, nor is there evidence that petitioners computed their gain and loss separately (other than for Federal income tax purposes). On the contrary, for the reasons discussed above, the record strongly indicates that petitioners regarded Holdner Farms as a single entity in which they each had an interest.

Second, the case cited in support of petitioners' argument is factually and legally distinguishable. In Bialock, the taxpayer planned to create a partnership among himself and two trusts established for the benefit of his two minor children, ages 9 and 15. Bialock v. Commissioner, supra at 650. The taxpayer planned to donate $2,500 to each trust in 1952 or 1953; the children were not expected to contribute any additional capital or any services to the partnership. Id. at 658. However, the trusts were never created, and the taxpayer's minor children never contributed any capital or services to the enterprise. Id. at 656, 658. We therefore held that no *28 partnership was formed because the parties did not in good faith and acting with a business purpose intend to join together in the present conduct of an enterprise. Id. at 659. By contrast, both petitioners made bona fide contributions of capital and labor to Holdner Farms, and both petitioners intended in good faith and with a business purpose to join together in the conduct of an enterprise.

Finally, even if we were to accept petitioners' argument that Holdner Farms was a joint venture of two individual proprietorships, we would still conclude that Holdner Farms was a partnership for Federal income tax purposes. A joint venture "has been defined as a `special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation,' and also as `an association of persons to carry out a single business enterprise for profit.'" Beck Chem. Equip. Corp. v. Commissioner, 27 T.C. 840, 848-849 (1957) (citing 48 C.J.S. Joint Adventures, secs. 1 and 2, Estate of Koen v. Commissioner, 14 T.C. 1406 (1950), and Osborn v. Commissioner, 22 B.T.A. 935, 945 (1931)). The existence of a joint venture "is a question of fact to be determined by reference to the same principles that govern the question of whether persons have formed a partnership * * * for tax purposes." Luna v. Commissioner, 42 T.C. at 1077. "[T]here are four basic attributes which are indicative of a joint venture: (1) A contract, express or implied, that a joint *29 venture be formed; (2) the contribution of money, property and/or services by the venturers; (3) an agreement for joint proprietorship and control; and (4) an agreement to share profits." S. & M. Plumbing Co. v. Commissioner, 55 T.C. 702, 707 (1971). A joint venture may create a separate entity for Federal income tax purposes if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom. Sec. 301.7701-1(a)(2), Proced. & Admin. Regs.; see also Allum v. Commissioner, T.C. Memo. 2005-177, affd. 231 Fed. Appx. 550 (9th Cir. 2007).

Even if Holdner Farms were a joint venture rather than a partnership, the joint venture would create a separate entity for Federal income tax purposes because petitioners carried on a farming business. Sec. 301.7701-1(a)(2), Proced. & Admin. Regs. As a domestic separate entity with at least two members, Holdner Farms would be treated as a partnership for Federal income tax purposes unless petitioners elected for the enterprise to be taxed as a corporation. Sec. 301.7701-3(b)(1)(i), Proced. & Admin. Regs. Petitioners did not file an election with respect to Hold[...] Thus, even if petitioners are correct that Holdner farms was a joint venture, the activity would still be treated as a partnership for Federal income tax purposes.

EXHIBIT B
12 of 32
EXHIBIT 2
9 of 14

## IV. Petitioners Were Equal Partners in Holdner Farms in 2004-2006 and Must Allocate Expenses Equally

30    Partnerships are not subject to tax as such. Sec. 701. *30 Persons carrying on business as partners are liable for tax only in their separate and individual capacities. Id. To determine income tax liability, each partner shall take into account his distributive share of partnership income, gain, loss, deduction, and credit. Sec. 702(a). A partner's distributive share of income, gain, loss, deduction, and credit is determined by the partnership agreement. Sec. 704(a). If the partnership agreement does not state how a partner's distributive share of income, gain, loss, deduction, or credit is to be determined, or if the allocation provided in the partnership agreement does not have substantial economic effect, the partner's distributive share shall be determined according to the partner's interest in the partnership. Sec. 704(b).

A partner's interest in a partnership refers to the manner "in which the partners have agreed to share the economic benefit or burden * * * corresponding to the income, gain, loss, deduction, or credit (or item thereof) that is allocated." Sec. 1.704-1(b)(3)(i), Income Tax Regs. A partner's interest in a partnership is determined by taking into account all the facts and circumstances. Sec. 704(b); Vecchio v. Commissioner, 103 T.C. 170, 193 (1994); sec. 1.704-1(b)(3)(i), Income Tax Regs. Partners are presumed to have equal per capita interests in the partnership. Sec. 1.704-1(b)(3)(i),

31    Income Tax Regs.[21] However, *31 the presumption may be rebutted by the taxpayer or the Commissioner by establishing that the partners' interests in the partnership were other than equal. Id.

In determining the partners' interests in the partnership, the following factors are relevant: (1) The partners' relative contributions to the partnership, (2) the partners' respective interests in partnership profits and losses, (3) the partners' relative interests in cashflow and other nonliquidating distributions, and (4) the partners' rights to capital upon liquidation. Sec. 1.704-1(b)(3)(ii), Income Tax Regs.; see also Estate of Ballantyne v. Commissioner, T.C. Memo. 2002-160, affd. 341 F.3d 802 (8th Cir. 2003). An examination of these factors supports respondent's argument that petitioners have presented insufficient evidence to rebut the presumption of equal partnership interests and that, therefore, petitioners must allocate both income and expenses equally.

## A. Petitioners' Contributions to Holdner Farms

32    The first factor requires an examination of petitioners' relative contributions to Holdner Farms. At trial William *32 Holdner estimated that he had contributed approximately $2.5 million to Holdner Farms since its formation and that Randal Holdner had contributed approximately $800,000, but he did not introduce any documentation to support his estimates. Relying solely on his self-serving estimates, he argued that he should be treated as owning a 75-percent interest in Holdner Farms. Neither petitioner quantified his contribution of labor to Holdner Farms.

William Holdner's estimate of his and Randal Holdner's capital contributions to Holdner Farms since 1977 is unsupported by any documentation in the record or by corroborating testimony. Petitioners did not maintain capital accounts for Holdner Farms, nor did they offer evidence concerning the relative values of the separately owned properties or the jointly owned properties at the time they were contributed to Holdner Farms. Moreover, William Holdner's estimate fails to account for his son's contribution of services to Holdner Farms. The record strongly suggests that Randal Holdner regarded his decades of work for Holdner Farms as "sweat equity", and he worked 16-18 hour days on the farm in part because he believed he had an equity interest in it.

Perhaps the most telling problem with petitioners' argument is that it is inconsistent with their own tax accounting.

33    Petitioners contend that William Holdner, as a 75-percent *33 partner, was entitled to 75 percent of Holdner Farms' losses, but William Holdner's actual share of Holdner Farms' total expenses, as reported on petitioners' 2004-2006 Federal income tax returns, ranged from 67.8 percent to 75.1 percent, and his share of Holdner Farms' ̶ ̶ ̶ ̶ ̶ ̶ was only 50 percent. A closer look at petitioners' treatment of particular items only makes matters more confusing: For example, William Holdner deducted 11.4 percent of Holdner Farms' depreciation and section 179 expenses in ̶ ̶ ̶ ̶ ̶ 79.4 percent in 2005, and 47.2 percent in 2006. Petitioners have presented no credible evidence of any ̶ ̶ ̶ ̶ ̶ ̶ ̶

EXHIBIT B
13 of 32
EXHIBIT 2
10 of 14

allocations that would adequately explain these variations.

We simply cannot estimate petitioners' relative contributions to Holdner Farms solely on the basis of evidence that is inconsistent, unsubstantiated, and self-serving. Thus, we conclude that petitioners have failed to rebut the presumption of equal partnership interests with respect to this factor.

## B. Petitioners' Respective Interests in Holdner Farms' Profits and Losses

The second factor requires us to examine petitioners' relative interests in Holdner Farms' economic profits and losses. Petitioners had equal interests in Holdner Farms' gross income in 2004-2006 and previous years, but petitioners' relative interests in Holdner Farms' expenses is less clear. For tax purposes, the allocation of Holdner Farms'

34   expenses between petitioners that William Holdner made each year was heavily weighted in his favor. *34 However, the record suggests that William Holdner did not bear the economic burden of the disproportionate allocation of farm expenses. The record reveals that all farm expenses during 2004-2006 were paid from farm revenue, which as we know was divided equally between petitioners. Consequently, we believe that the economic reality of petitioners' arrangement is that petitioners bore the economic burden of farm expenses equally despite the disproportionate allocation of expenses reflected on the tax returns William Holdner prepared for 2004-2006. We therefore conclude that petitioners have failed to rebut the presumption of equal partnership interests with respect to this factor.

## C. Petitioners' Relative Interests in Cashflow and Other Nonliquidating Distributions

The third factor we consider is petitioners' relative interests in cashflow and other nonliquidating distributions. The record establishes that petitioners had equal interests in Holdner Farms' cashflow and nonliquidating distributions. During 2004-2006 petitioners were entitled to draws from the Holdner Farms account. Petitioners each also had an unlimited right to withdraw funds from the Holdner Farms account at any time. The only limit on petitioners' rights to withdraw funds from the Holdner Farms account was their apparent agreement not to overdraw it. Petitioners did not offer any evidence that either of them exercised greater control over cashflow and nonliquidating distributions than the

35   other. Moreover, there is *35 no evidence that Holdner Farms ever made a disproportionate distribution to either partner. Thus, we conclude that petitioners had an equal interest in Holdner Farms' cashflow and nonliquidating distributions.

## D. Petitioners' Rights to Capital Upon Liquidation

Finally, petitioners offered no credible evidence regarding their rights to liquidating distributions from Holdner Farms. Although petitioners agreed that the entire Holdner Farms enterprise would be devised to Randal Holdner upon the death of William Holdner, petitioners apparently never considered how the property used in the enterprise would be distributed in the event that Holdner Farms were liquidated while both partners were still alive. Randal Holdner testified that he believed he had an interest in the separately owned properties as early as 1977, and that belief seems to be supported by the fact that income generated by timbering on one of the separately owned properties was divided equally between petitioners. However, like many parts of the record, the testimony on this point was vague and uncertain and not sufficient to rebut the presumption of equal partnership interests.

We conclude on the basis of the entire record that respondent properly determined that Holdner Farms was a

36   partnership for Federal income tax purposes and that in the absence of substantial proof rebutting the presumption of *36 equality, petitioners had equal interests in partnership income, expenses, and other partnership items.

## V. Section 6662 Accuracy-Related Penalty

EXHIBIT B
14 of 32
EXHIBIT 2
11 of 14

Section 6662(a) and (b)(1) authorizes the Commissioner to impose an accuracy-related penalty equal to 20 percent of the underpayment attributable to negligence or disregard of rules or regulations. For purposes of section 6662, negligence is any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and disregard includes any careless, reckless, or intentional disregard. Sec. 6662(c); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985) (negligence is lack of due care or failure to do what a reasonable and prudent person would do under the circumstances); sec. 1.6662-3, Income Tax Regs. Negligence also includes any failure to exercise ordinary and reasonable care in the preparation of a tax return or any failure to keep adequate books and records and to properly substantiate items. Sec. 1.6662-3(b)(1), Income Tax Regs. Negligence is strongly indicated where, inter alia, "A taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction * * * which would seem to a reasonable and prudent person to be `too good to be true' under the circumstances". Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. A return position that has a reasonable basis is not attributable to negligence. Sec. 1.6662-3(b)(1), Income Tax Regs. A reasonable basis standard is a relatively high standard *37 that is significantly higher than a not frivolous standard. Sec. 1.6662-3(b)(3), Income Tax Regs. The reasonable basis standard is not satisfied where a return position is merely arguable or colorable. Id.

Section 6662(a) and (b)(2) authorizes the Commissioner to impose a 20-percent penalty if there is a substantial understatement of income tax.[22] An understatement of tax is the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax actually shown on the return. Sec. 6662(d)(2)(A). In the case of an individual, a substantial understatement is an understatement that exceeds 10 percent of the tax required to be shown on the return for the taxable year, or $5,000, whichever is greater. Sec. 6662(d)(1)(A). However, the amount of an understatement is reduced to the extent the taxpayer has "substantial authority" for the position taken. Sec. 6662(d)(2)(B)(i). Substantial authority is an objective standard requiring an analysis of the law and an application of the law to the relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs.

The Commissioner bears the initial burden of production with respect to a taxpayer's liability for the section 6662 penalty; *38 i.e., the Commissioner must first produce sufficient evidence to establish that imposition of the section 6662 penalty is appropriate. Sec. 7491(c); Kikalos v. Commissioner, 434 F.3d 977, 986 (7th Cir. 2006), affg. T.C. Memo. 2004-82. If the Commissioner satisfies his initial burden of production, the burden of producing evidence to refute the Commissioner's evidence shifts to the taxpayer. See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

Respondent has satisfied his burden of production with respect to negligence by establishing that William Holdner failed to make a reasonable attempt to comply with the Code. Specifically, respondent has established that William Holdner failed to make a reasonable attempt to ascertain the correctness of his reporting positions with respect to Holdner Farms. As a practicing accountant with decades of experience, William Holdner knew that a disproportionate allocation of Holdner Farms' expenses to him would allow him to shelter hundreds of thousands of dollars in unrelated income. William Holdner did not introduce any credible evidence that he acted reasonably in doing so or that he conducted any research on the proper classification of Holdner Farms for tax purposes before he decided to prepare the 2004-2006 returns as he did. Although petitioners assert that William Holdner is not liable for the section 6662 accuracy-related penalties, their arguments amount to little more than a recitation of arguments we have previously rejected, e.g., *39 Holdner Farms was, in fact, two individual proprietorships, petitioners never formed a partnership, etc. Because we conclude that William Holdner is liable for the 20-percent accuracy-related penalty for negligence, we need not consider whether he is also liable for the section 6662 penalty for a substantial understatement.

## VI. Conclusion

We have considered the parties' other arguments, and to the extent not discussed herein, we conclude the arguments are irrelevant, moot, or without merit. In summary, we hold that Holdner Farms was a partnership for Federal income tax purposes in 2004-2006. Further, we hold that petitioners were equal partners in the partnership during the years at issue and that Holdner Farms' income, expenses, and other partnership items must be allocated accordingly. Finally, we hold that petitioner William Holdner is liable for the section 6662 accuracy-related penalty for 2004-2006.

40        *40 To reflect the foregoing,

**EXHIBIT B**
**15 of 32**
**EXHIBIT 2**
**12 of 14**

Decisions will be entered under Rule 155.

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Respondent's counsel explained at trial that respondent took these positions to avoid a potential whipsaw situation and to bring the entire case before the Court. Respondent's counsel acknowledged that each petitioner should be allocated only one-half of Holdner Farms' gross income and that each petitioner should be allowed to deduct one-half of Holdner Farms' expenses. Respondent does not intend to pursue deficiencies and penalties in the amounts shown on the notices of deficiency.

[3] William Holdner still owns the Home Place property, but petitioners no longer live there.

[4] William Holdner testified at trial regarding his estimate of the respective contributions to Holdner Farms made by him and Randal Holdner, but he did not introduce any documentation to support his estimates. On the record before us we cannot quantify petitioners' respective contributions to Holdner Farms since 1977, and we decline to do so solely on the basis of William Holdner's undocumented and self-serving estimates, which we do not find credible.

[5] William Holdner explained at trial that he wanted Holdner Farms to remain intact upon his death in order to increase the likelihood that the farm would remain a profitable business for his son.

[6] Randal Holdner certainly believed he had an equity interest in Holdner Farms. When Randal Holdner's mother claimed that Holdner Farms was marital property in connection with her divorce from William Holdner, Randal Holdner filed a lawsuit against his parents seeking a judicial declaration recognizing and enforcing his interest in Holdner Farms, including the separately owned properties. See Holdner v. Holdner, 29 P.3d 1199 (Or. Ct. App. 2001). During the trial Mrs. Holdner testified that she was not a party to any alleged agreement between petitioners, and the trial court found her testimony credible. Id. at 1202-1204. The trial court also found that Mrs. Holdner received no consideration for the alleged contract between petitioners. Id. at 1203. On appeal, the Court of Appeals of Oregon affirmed the trial court's judgment, concluding that Randal Holdner had failed to establish the alleged contract by a preponderance of the evidence. Subsequently, petitioners and Mrs. Holdner entered into a settlement agreement under which Mrs. Holdner released her claims to any part of Holdner Farms and any other marital property in exchange for $400,000, which was paid by Holdner Farms out of its income from timber sales, and other consideration.

Neither petitioners nor respondent contend that the judgment in Holdner v. Holdner, supra, is binding on this Court, and we are satisfied that the doctrine of collateral estoppel, or issue preclusion, is not applicable. See Ron Lykins, Inc. v. Commissioner, 133 T.C. 87, 100-101 (2009). This case involves later years and different issues, and the facts relating to the operation of Holdner Farms have changed.

[7] A land sales contract is a contract that uses seller financing to enable a purchaser to acquire property over time by permitting the purchaser to pay the seller in installments. The purchaser takes possession of the property immediately but does not acquire title to the property until the loan is completely repaid. See Black's Law Dictionary 371 (9th ed. 2009).

[8] Several of the jointly purchased properties are close or adjacent to one another, and there is some ambiguity in the record regarding the exact size and location of some of the properties. For example, the stipulation of facts refers to the Ernest property and the Johnson Landing Road property as separate properties, but Randal Holdner referred to the property at trial as a single property. Moreover, the stipulation of facts states that the Ernest property and the Johnson Landing Road property consisted of 54.24 and 115.32 acres, respectively, but Randal Johnson testified that the combined property was 204 acres. The details regarding the property or properties do not affect our resolution of the issues in this case. For simplicity, we shall treat the Ernest and Johnson Landing Road properties as a single property.

[9] The purchase price was allocated $125,000 to the land and $50,000 to the timber.

[10] During 2004-2006 petitioners received $5,000 per month in rent from the nursery.

[11] Randal Holdner has lived in one of the houses since the mid-1990s.

[12] A tenancy in common is "A tenancy by two or more persons, in equal or unequal undivided shares, each person having an equal right to possess the whole property but no right of survivorship." Black's Law Dictionary 1604 (9th ed. 2009).

[13] Once again, petitioners never put their agreement in writing, though William Holdner told his daughter that upon his death she would not inherit anything from the Holdner Farms operation. Instead, William Holdner explained to his daughter that the farm operation would remain intact. Petitioners apparently never considered what would happen to the properties in the event Randal Holdner predeceased his father.

**EXHIBIT B**
**16 of 32**
**EXHIBIT 2**
**13 of 14**

[14] Petitioners reported their gain from timber sales on Schedules D of their Federal income tax returns.

[15] In some instances, William Holdner reported 100 percent of Holdner Farms' gross income from a particular item on his returns and then deducted Randal Holdner's 50-percent share as an expense. On his 2004 Schedule F, for example, William Holdner reported $277,932 in sales of livestock and deducted $138,966 as cost or other basis. Similarly, on his 2004 return William Holdner reported $94,350 of rental income related to the Holdner Farms activity, and he deducted $47,175 as a rent or lease expense attributable to land.

[16] William Holdner appeared to assert at trial that his allocation of expenses was related to his and Randal Holdner's respective investments in Holdner Farms and to their agreements regarding specific Holdner Farms expenses, although the testimony in question was often unclear and confused. William Holdner's assertions are not substantiated in the record, and we reject them as self-serving and not credible.

[17] "A whipsaw occurs when different taxpayers treat the same transaction involving the same items inconsistently, thus creating the possibility that income could go untaxed, or two unrelated parties could deduct the same expenses on their separate returns." Maggie Mgmt. Co. v. Commissioner, 108 T.C. 430, 446 (1997).

[18] The definition of a partnership for Federal income tax purposes is basically the same as the definition of a partnership for commercial law purposes but more detailed. 1 Willis & Postlewaite, Partnership Taxation, par. 1.03[1], at 1-31 (6th ed. 2009).

[19] Where one partner contributes property and the other contributes services, a partnership is formed, but additional tax complications may arise. See 1 McKee, et al., Federal Taxation of Partnerships and Partners, par. 5.01, at 5-2 (4th ed. 2007). For example, receipt of a partnership interest solely in exchange for past services or anticipated future services does not qualify for nonrecognition under sec. 721. Id. par. 5.02. Thus, the value of a partnership interest received solely in exchange for services may constitute gross income to the partner on receipt. Id. Respondent does not raise any such issue with respect to either petitioner for the years at issue.

[20] With respect to Holdner Farms' expenses, the record does not establish that petitioners agreed to or even discussed any specific division or allocation of Holdner Farms' expenses. The record does support a conclusion that William Holdner arbitrarily and unilaterally allocated farm expenses between himself and his son primarily to shelter William Holdner's other income, most particularly his substantial income from his accounting practice. That allocation was made on an annual basis without any apparent input from Randal Holdner.

[21] Sec. 1.704-1(b)(3)(i), Income Tax Regs., was amended in 2008. T.D. 9398, 2008-1 C.B. 1143. The regulation as amended no longer contains the presumption that all partners' interests in a partnership are equal, on a per capita basis. See id., 2008-1 C.B. at 1146-1147. Sec. 1.704-1(b)(3)(i) as amended by T.D. 9398, supra, applies to partnership taxable years beginning on or after May 19, 2008. Id., 2008-1 C.B. at 1147. Accordingly, the amended regulation does not apply to this case. We apply the version of sec. 1.704-1(b)(3)(i), in effect for the years at issue.

[22] Only one sec. 6662 accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one of the types of conduct listed in sec. 6662(b). New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. 161, 187 (2009); sec. 1.6662-2(c), Income Tax Regs.

Save trees - read court opinions online on Google Scholar.

EXHIBIT B
17 of 32
EXHIBIT 2
14 of 14



A Neutral
As of: February 3, 2017 2:39 PM EST

# Holdner v. Comm'r

United States Court of Appeals for the Ninth Circuit

October 10, 2012,[**] Submitted, Portland, Oregon; October 12, 2012, Filed

No. 11-71593

---

[**] The panel unanimously concludes this case is suitable for decision without oral argument. *See* **EXHIBIT 3** Fed. R. App. P.
34(a)(2).

**Reporter**

483 Fed. Appx. 383 *; 2012 U.S. App. LEXIS 21182 **; 2012-2 U.S. Tax Cas. (CCH) P50,626; 110 A.F.T.R.2d (RIA) 6324; 2012 WL 4845557

WILLIAM F. HOLDNER, Petitioner - Appellant, v. COMMISSIONER OF INTERNAL REVENUE, Respondent - Appellee.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** Appeal from a Decision of the United States Tax Court. Tax Ct. No. 10375-08.
Holdner v. Comm'r, T.C. Memo 2010-175, 2010 Tax Ct. Memo LEXIS 211 (T.C., 2010)

**Disposition:** AFFIRMED.

# Core Terms

tax court, partnership, federal tax purposes, Notice

**Counsel:** For WILLIAM F. HOLDNER, Petitioner - Appellant: Kevin P. O'Connell, Hagen O'Connell LLP, Portland, OR.

For COMMISSIONER OF INTERNAL REVENUE, Respondent - Appellee: Gilbert Steven Rothenberg, Esquire, Deputy Assistant Attorney General, Tamara W. Ashford, Deputy Assistant Attorney General, Thomas J. Clark, Supervisory Attorney, John A. DiCicco, Acting Assistant Attorney General, DOJ - U.S. DEPARTMENT OF JUSTICE, Washington, DC; Damon Taaffe, UNITED STATES DEPARTMENT OF JUSTICE, Washington, DC; Robert R. Di Trolio, Esquire, Clerk, U.S. Tax Court, Washington, DC; William J. Wilkins, Chief Counsel, INTERNAL REVENUE SERVICE, Washington, DC.

**Judges:** Before: SILVERMAN, CLIFTON, and N.R. SMITH, Circuit Judges.

# Opinion

**[*383]** MEMORANDUM*

---

* This disposition is not appropriate for publication and

1. It was not clearly erroneous for the tax court to conclude that Holdner Farms operated as a partnership between 2004 and 2006. The facts in the record support the plausible inference that Holdner Farms operated as a partnership for **[**2]** federal tax purposes between 2004 and 2006: (a) Randal and William Holdner operated Holdner Farms as a business; and (b) both contributed capital and labor to the enterprise, managed its operations, shared the profits of the business, made withdrawals from Holdner Farms's bank account, and held out Holdner Farms as a partnership. *Comm'r v. Culbertson,* 337 U.S. 733, 742, 69 S. Ct. 1210, 93 L. Ed. 1659, 1949-2 C.B. 5 (1949); *Luna v. Comm'r,* 42 T.C. 1067, 1077-78 (1964).

2. On *de novo* review, the Notice of Deficiency (NOD) was not inadequate; it met the requirements of I.R.C. § 7522. There is no legal basis for Holdner's argument that the NOD was required to notify him of what would be relevant at trial. But even if such a requirement did exist, the NOD in this case would satisfy it. The NOD stated that the basis for the deficiency was that Holdner Farms had operated as a partnership, but had not properly allocated the business's expenses between the partners. That information was sufficient to put Holdner on notice that the **[*384]** issue of whether Holder Farms was a partnership for federal tax purposes would be highly relevant at trial.

3. Under Federal Rules of Evidence 611(a) and 614(b) (as applied to proceedings in U.S. Tax Court by Tax Court Rule 143(a)), **[**3]** the tax court judge did not abuse her discretion in her management of trial or questioning of witnesses. The decision of the tax court is therefore

AFFIRMED.

EXHIBIT B
19 of 32
EXHIBIT 3
2 of 2



A Neutral
As of: February 3, 2017 2:38 PM EST

# Holdner v. Comm'r

United States Court of Appeals for the Ninth Circuit

November 18, 2015[**], Submitted; December 1, 2015, Filed

No. 13-74197

---

[**] The panel unanimously concludes this case is suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).

**Reporter**

623 Fed. Appx. 892 *; 2015 U.S. App. LEXIS 20825 **; 116 A.F.T.R.2d (RIA) 6935

WILLIAM F. HOLDNER, Petitioner - Appellant, v. COMMISSIONER OF INTERNAL REVENUE, Respondent - Appellee.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** Related proceeding at Holdner v. Comm'r, 2016 U.S. Dist. LEXIS 162531 (D. Or., Nov. 23, 2016)

**Prior History: [**1]** Appeal from a Decision of the United States Tax Court. Tax Ct. No. 3817-13.

**Disposition:** AFFIRMED.

## Core Terms

res judicata, summary judgment, issues, merits

**Counsel:** WILLIAM F. HOLDNER, Petitioner - Appellant, Pro se, Portland, OR.

For COMMISSIONER OF INTERNAL REVENUE, Respondent - Appellee: Patricia McDonald Bowman, Trial Attorney, Richard Caldarone, Attorney, Thomas J. Clark, Supervisory Attorney, DOJ - U.S. DEPARTMENT OF JUSTICE, Tax Division/Appellate Section, Washington, DC; Gilbert Steven Rothenberg, Esquire, Deputy Assistant Attorney General, DOJ - U.S. Department of Justice, Civil Division -- Appellate Staff, Washington, DC; William J. Wilkins, Chief Counsel, INTERNAL REVENUE SERVICE, Washington, DC.

**Judges:** Before: TASHIMA, OWENS, and FRIEDLAND, Circuit Judges.

## Opinion

**[*892]** MEMORANDUM[*]

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

William F. Holdner appeals pro se from the Tax Court's summary judgment permitting the Internal Revenue Service to collect on his federal income tax liabilities for years 2004 to 2006. We have jurisdiction under 26 U.S.C. § 7482(a)(1). We review de novo, *Sollberger v. Comm'r*, 691 F.3d 1119, 1123 **[*893]** (9th Cir. 2012), and we affirm.

The Tax Court properly sustained the collection action because Holdner was precluded from challenging the validity of the underlying tax assessments, as the matter **[**2]** had been resolved in prior litigation. *See* 26 U.S.C. §§ 6330(c)(2)(B), 6330(c)(4)(A)(i) (limiting issues a taxpayer may challenge at a Collection Due Process hearing); *Comm'r v. Sunnen*, 333 U.S. 591, 598-99, 68 S. Ct. 715, 92 L. Ed. 898 (1948) (discussing the application of res judicata principles in tax litigation); *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 988 (9th Cir. 2005) (summary judgment is a final judgment on the merits for res judicata purposes); *Baker v. IRS* (*In re Baker*), 74 F.3d 906, 910 (9th Cir. 1996) (per curiam) (res judicata precludes relitigation of issues that were or could have been raised in the prior action; "once a taxpayer's liability for a particular year is litigated, 'a judgment on the merits is res judicata as to any subsequent proceeding involving the same claim and the same tax year.'" (citation omitted)).

We do not consider Holdner's contentions concerning the propriety of the judgment entered in his prior tax case, which were addressed in a prior appeal. *See Holdner v. Comm'r*, 483 F. App'x 383 (9th Cir. 2012).

**AFFIRMED**.

---

**EXHIBIT B**
**21 of 32**
**EXHIBIT 4**
**2 of 2**



A Neutral

As of: February 3, 2017 2:38 PM EST

# Holdner v. Comm'r

United States District Court for the District of Oregon

November 23, 2016, Decided; November 23, 2016, Filed

3:16-CV-00475-BR

**Reporter**

2016 U.S. Dist. LEXIS 162531 *; 2016-2 U.S. Tax Cas. (CCH) P50,486

WILLIAM F. HOLDNER D/B/A HOLDNER FARMS, Plaintiff, v. COMMISSIONER OF INTERNAL REVENUE, Defendant.

**Prior History:** Holdner v. Comm'r, 623 Fed. Appx. 892, 2015 U.S. App. LEXIS 20825 (9th Cir., 2015)

## Core Terms

tax court, res judicata, subject-matter, refund, assessments, defense motion, district court, refund claim, collected, taxes, tax year, issues, merits, fail to state a claim, tax return, allegations, partnership, litigated, expenses, Notices

**Counsel:** [*1] WILLIAM F. HOLDNER, Plaintiff, Pro se, Portland, OR.

For Defendant: BILLY J. WILLIAMS, United States Attorney, Portland, OR; CAROLINE D. CIRAOLO, Principal Deputy Assistant Attorney General, DYLAN C. CERLING, Assistant Attorney General, United States Department of Justice, Washington, DC.

**Judges:** ANNA J. BROWN, United States District Judge.

**Opinion by:** ANNA J. BROWN

## Opinion

**OPINION AND ORDER**

**BROWN, Judge**.

This matter comes before the Court on Defendant's Motion (#15) to Dismiss for Lack of Subject-Matter Jurisdiction, Failure to State a Claim for Relief, and Res Judicata. For the reasons that follow, the Court **GRANTS** Defendant's Motion and **DISMISSES** this matter **with prejudice**.

### BACKGROUND

The following facts are taken from Plaintiff's Complaint and the parties' materials related to Defendant's Motion to Dismiss.

During the relevant period Plaintiff William Holdner and his son Randal Holdner (collectively referred to as the Holdners) ran Holdner Farms, a cattle business. The Holdners each "effectively reported one-half of Holdner Farms' gross income for 2004, 2005, and 2006 on Schedules F, Profit or Loss From Farming and Schedules D, Capital Gains and Losses, of their respective Federal income tax returns for those years." [*2] Decl. of Dylan Cerling, Ex. 4 at 2. The Holdners, however, did not split the expenses of Holdner Farms equally on their tax returns. Plaintiff "deducted most of Holdner Farms' expenses." *Id.* at 3. The Holdners also did not file federal partnership returns.

At some point the Internal Revenue Service (IRS) issued Notices of Deficiency to the Holdners in which it determined: (1) Holdner Farms was a partnership (or a joint venture taxed as a partnership) for federal income tax

EXHIBIT B
22 of 32
EXHIBIT 5
1 of 6

purposes in 2004-2006, (2) the Holdners were equal partners in the partnership, and (3) Plaintiff was liable for an accuracy-related penalty for 2004-2006 pursuant to 26 U.S.C. § 6662. The Holdners petitioned the United States Tax Court to review the IRS's determinations.

On August 4, 2010, the Tax Court issued a Memorandum Findings of Fact and Opinion in which it found "the allocation of expenses made by [Plaintiff] had no apparent rational basis and appeared completely arbitrary." Cerling Decl., Ex. 4 at 15. The Tax Court held Holdner Farms was a partnership rather than a joint venture of two individual proprietorships or at least had to be treated as such for federal tax purposes. Id. at 29-31. Accordingly, the Tax Court held the Holdners **[*3]** had to allocate income and expenses equally and that the IRS had properly assessed an accuracy-related penalty for Plaintiff because he had incorrectly included expenses on his tax return that should have been included on Randal Holdner's tax return. Id. at 32-37, 40.

On September 7, 2010, Plaintiff filed a motion with the Tax Court seeking reconsideration of its opinion. On October 22, 2010, the Tax Court denied Plaintiff's motion for reconsideration. Plaintiff appealed. On October 12, 2012, the Ninth Circuit affirmed the Tax Court's decisions.

At some point Plaintiff brought another action in Tax Court addressing the same tax years at issue in his 2010 proceeding and asserting the same arguments against his deficiency and penalty assessments that he had asserted in his 2010 proceeding. The parties cross-moved for summary judgment.

On November 13, 2013, the Tax Court granted the Commissioner's motion for summary judgment and denied Plaintiff's motion for summary judgment noting Plaintiff "is barred by the doctrine of res judicata from attempting to challenge his liabilities a second time in this proceeding." Cerling Decl., Ex. 7 at 5.

Plaintiff appealed the Tax Court's November 2013 decision. On November **[*4]** 18, 2015, the Ninth Circuit affirmed the decision and noted the Tax Court had properly concluded Plaintiff "was precluded from challenging the validity of the underlying tax assessments, as the matter had been resolved in prior litigation." Cerling Decl.,

Ex. 8 at 3. The Ninth Circuit also noted it did "not consider [Plaintiff's] contentions concerning the propriety of the judgment entered in his [2010] tax case, which were addressed in a prior appeal." Id.

On March 18, 2016, Plaintiff filed a Complaint in this Court pursuant to 42 U.S.C. § 1983 in which he alleges "the collection of assessments[1] for the years 2004, 2005, and 2006 are invalid under the Internal Revenue Code"; the original Notice of Deficiency was defective; and "the IRS audit was not conducted in accordance with statutory and administrative procedures and therefore the assessments are invalid in violation of due process." Compl. at 2.

On September 21, 2016, Defendant filed a Motion to Dismiss for Lack of Subject-Matter Jurisdiction, Failure to State a Claim for Relief, and **[*5]** Res Judicata. The Court took Defendant's Motion under advisement on October 20, 2016.

## STANDARDS

### I. Dismissal for Lack of Jurisdiction Pursuant to Rule 12(b)(1)

Plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." United States ex rel. Mateski v. Raytheon Co., 816 F.3d 565, 569 (9th Cir. 2016)(quotation omitted). See also Ass'n of Am. Med. Coll. v. United States, 217 F.3d 770 (9th Cir. 2000).

When deciding a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court may consider affidavits and other evidence supporting or attacking the complaint's jurisdictional allegations. Rivas v. Napolitano, 714 F.3d 1108, 1114 n.1 (9th Cir. 2013). The court may permit discovery to determine whether it has jurisdiction. Laub v. United States Dep't of Interior, 342 F.3d 1080, 1093 (9th Cir. 2003). When a defendant's motion to dismiss for lack of jurisdiction "is based on written materials

---

[1] The record does not reflect Plaintiff has paid the deficiencies or penalties assessed against him or that he has filed a refund claim related to tax years 2004 - 2006.

EXHIBIT B
23 of 32
EXHIBIT 5
2 of 6

rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011)(citation omitted).

## II. Dismissal for Failure to State a Claim Pursuant to Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic v. Twombly*, 550 U.S. 544,] 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable **[*6]** for the misconduct alleged. *Id.* at 556. . . . The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). *See also Bell Atlantic*, 550 U.S. at 555-56. The court must accept as true the allegations in the complaint and construe them in favor of the plaintiff. *Din v. Kerry*, 718 F.3d 856, 859 (9th Cir. 2013).

The pleading standard under Federal Rule of Civil Procedure 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). *See also* Fed. R. Civ. P. 8(a)(2). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). A complaint also does not suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012)(citation omitted). A court, however, "may consider **[*7]** a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007)(citation omitted).

## DISCUSSION

Defendant moves to dismiss Plaintiff's Complaint on the grounds that this Court lacks subject-matter jurisdiction, this matter is barred by *res judicata*, and Plaintiff fails to state a claim.

## I. Substitution of United States for Commissioner.

The Supreme Court and Ninth Circuit have made clear that a claim against an officer or agent of the United States concerning actions taken in his official capacity must be construed as an action against the United States. *See Dugan v. Rank*, 372 U.S. 609, 83 S. Ct. 999, 10 L. Ed. 2d 15 (1963). *See also Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985)("[A] suit against IRS employees in their official capacity is essentially a suit against the United States."); *Lai v. Ipson*, 474 F. App'x 595, 596 (9th Cir. 2012)(same).

Accordingly, the Court substitutes the United States as Defendant in this matter.

## II. This Court lacks subject-matter jurisdiction.

In his Complaint Plaintiff "prays the collection of the assessments and penalties are reversed." Compl. at 8.

28 U.S.C. § 1346(a)(1) provides district courts have "original jurisdiction, concurrent with the United States Court of Federal Claims" over civil actions against the United States "for the recovery of **[*8]** any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal

EXHIBIT B
24 of 32
EXHIBIT 5
3 of 6

revenue laws." The Supreme Court noted: "Despite its spacious terms, § 1346(a)(1) must be read in conformity with other statutory provisions which qualify a taxpayer's right to bring a refund suit upon compliance with certain conditions." *United States v. Dalm*, 494 U.S. 596, 601, 110 S. Ct. 1361, 108 L. Ed. 2d 548 (1990). Specifically, 26 U.S.C. § 7422(a)

> limits a taxpayer's right to bring a refund suit by providing that "[n]o suit or proceeding shall be maintained . . . for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary."

*Id.* (quoting § 7422(a)). *See also Byrne v. United States*, 127 Fed. Cl. 284, 290 (2016)("To file a federal tax refund suit . . . a plaintiff first must file a claim for refund with the IRS, within the time period proscribed by 26 U.S.C. § 6511(a).").

In addition, the Supreme Court has held a taxpayer must fully pay a tax assessment **[*9]** before he may bring a refund action pursuant to § 1346. *Flora v. United States*, 362 U.S. 145, 177, 80 S. Ct. 630, 4 L. Ed. 2d 623, 1960-1 C.B. 660 (1960). *See also Intersport Fashions West, Inc. v. United States*, 84 Fed. Cl. 454, 456 (2008)("[T]he Supreme Court has limited the jurisdiction of this court (and the district courts) in tax refund suits to those claims in which the taxpayer has paid fully all tax assessed for the tax year at issue prior to the initiation of the claim."); *Byrne v. United States*, 127 Fed. Cl. 284, 290 (2016)("[B]efore filing suit, a taxpayer must pay the full amount of the tax alleged to be due.").

Finally, 26 U.S.C. § 6512 provides "no suit by the taxpayer for the recovery of any part of the tax shall be instituted in any court" when "the Secretary has mailed to the taxpayer a notice of deficiency . . . and . . . the taxpayer files a petition with the Tax Court . . . [and] the Secretary has determined the deficiency shall be allowed or made." Accordingly, § 6512 "precludes a district court from redetermining

tax liability once the Tax Court has done so." *George v. United States*, No. C07-01369 MJJ, 2007 U.S. Dist. LEXIS 59001, 2007 WL 2318922, at *2 (N.D. Cal. Aug. 13, 2007)(citing *First Nat'l Bank of Chicago v. United States*, 792 F.2d 954, 956 (9th Cir. 1986). The Ninth Circuit has held § 6512 has a "broad general application [such] that if the taxpayer files a petition with the tax court, the mere filing of the petition operates to deprive the district court of jurisdiction to entertain a subsequent suit for refund." *First Nat'l Bank of Chicago*, 792 F.2d at 956. The court stated this is the rule even when the issues sought to be **[*10]** litigated in the district court were not presented in the Tax Court. *Id.* at 955 ("It is not the decision which the Tax Court makes but the fact that the taxpayer has resorted to that court which ends his opportunity to litigate in the District Court his tax liability for the year in question.").

Thus, in order for this Court to have jurisdiction over this matter, Plaintiff must establish he has filed a claim for refund with the IRS, he has paid the full amount of tax allegedly due, and he has not filed a petition with the Tax Court.

Plaintiff did not allege in his Complaint or in his Response to Defendant's Motion to Dismiss that he has filed a refund claim with the IRS. In addition, the record filed by Defendant that includes a report summarizing Plaintiff's tax returns, assessments, deficiencies, and payments does not reflect Plaintiff has filed any refund claim. Plaintiff, therefore, has not established he filed a refund claim before he filed this action. In addition, it is undisputed that Plaintiff has not fully paid his taxes and penalties for the period at issue. Finally, the record reflects Plaintiff has twice challenged the IRS's Notices of Deficiency for tax years 2004-2006 in Tax Court. **[*11]** Thus, Plaintiff has not established this Court has subject-matter jurisdiction as to Plaintiff's refund claim.

Accordingly, the Court grants Defendant's Motion to Dismiss Plaintiff Complaint for lack of subject-matter jurisdiction.

### III. The Anti-Injunction Act bars Plaintiff's claim to the extent that he seeks declaratory or prospective relief.

Defendant asserts to the extent that Plaintiff

EXHIBIT B
25 of 32
EXHIBIT 5
4 of 6

seeks declaratory or prospective relief, this Court lacks subject-matter jurisdiction due to the Anti-Injunction Act, 26 U.S.C. § 7421. Specifically, the Anti-Injunction Act states: "[E]xcept as provided in [sections of the Internal Revenue Code not relevant here] no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a). The Supreme Court has held the "principal purpose" of the Anti-Injunction Act is to "protect[] . . . the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, and to require that the legal right to the disputed sums be determined in a suit for refund." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736, 94 S. Ct. 2038, 40 L. Ed. 2d 496 (1974)(quotation omitted). *See also Hansen v. Dep't of Treasury*, 528 F.3d 597, 600 (9th Cir. 2007)(same).

The Ninth Circuit has held an action that does not fall within an exception **[*12]** to the Anti-Injunction Act must be dismissed for lack of subject-matter jurisdiction. *See Elias v. Connett*, 908 F.2d 521, 526 (9th Cir. 1990)(concluding the district court did not have subject-matter jurisdiction when the plaintiff did not establish his action fell within any exception to the Anti-Injunction Act). *See also Hansen*, 528 F.3d at 601 ("[T]he Anti-Injunction Act precludes federal jurisdiction over Hansen's claim [seeking an exemption from self-employment social security taxes] unless he is able to satisfy the judicially created exception to the Act.").

It is undisputed that none of the statutory exceptions to the Anti-Injunction Act apply here. The Supreme Court, however, has also recognized a limited judicial exception when a taxpayer establishes: (1) "under no circumstances" could the United States ultimately prevail on the merits and (2) the plaintiff would suffer irreparable injury for which they do not have any adequate remedy at law. *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 6-8, 82 S. Ct. 1125, 8 L. Ed. 2d 292 (1962). *See also United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 12-13, 128 S. Ct. 1511, 170 L. Ed. 2d 392 (2008)(same). Plaintiff, however, cannot satisfy either prong of the judicial exception. Specifically, Plaintiff cannot establish the United States will not prevail on the

merits of this matter under any circumstances because the IRS has already prevailed in Tax Court and in the Ninth Circuit on the issues raised **[*13]** in Plaintiff's claim. In addition, Plaintiff has not established his tax and penalty assessments have placed him in danger of immediate, irreparable injury for which he does not have any adequate remedy at law. Plaintiff could pay the assessed taxes, file a proper refund claim with the IRS, and file a refund action if the IRS denies that claim. *See Hansen*, 528 F.3d at 601 (finding the plaintiff could not satisfy the judicial exception because "[t]his is not a case in which an aggrieved party has no access at all to judicial review. . . . [The plaintiff] may pay income taxes, or, in their absence, an installment of FICA or FUTA taxes, exhaust the Service's internal refund procedures, and then bring suit for a refund. These review procedures offer petitioner a full, albeit delayed, opportunity to litigate [his claims]."). Thus, the Court concludes the Anti-Injunction Act applies to Plaintiff's claim and, therefore, this Court lacks subject-matter jurisdiction as to Plaintiff's claim to the extent that he seeks declaratory or prospective relief.

## IV. Even if this Court has subject-matter jurisdiction, Plaintiff's claim is barred by *res judicata*.

Defendant asserts even if this Court has jurisdiction, Plaintiff's claim **[*14]** is barred by *res judicata* because Plaintiff already has litigated his claims twice in the Tax Court.

Although Plaintiff asserts in his Response that *res judicata* "may not be a bar to Federal Due Process Rights or a challenge of a collection of tax in violation of the tax code," the Ninth Circuit has made clear that "[r]es judicata principles apply in tax litigation." *Russell v. Commissioner*, 678 F.2d 782, 785 (9th Cir. 1982)(citing *Comm'r v. Sunnen*, 333 U.S. 591, 68 S. Ct. 715, 92 L. Ed. 898 (1948)). *See also Singh v. United States*, No. 2:13-cv-780-TLN-EFB PS, 2015 U.S. Dist. LEXIS 54806, 2015 WL 1801347, at *2 (E.D. Cal. Mar. 31, 2015)("Plaintiff essentially seeks to relitigate the issues already resolved by the Tax Court, which are the subject of his pending before the Ninth Circuit. He is barred from doing so. This Court lacks jurisdiction to review the decision of the Tax Court.").

EXHIBIT B
26 of 32
EXHIBIT 5
5 of 6

.Furthermore, Plaintiff's claim is barred by the doctrine of *res judicata*.")(citing *Russell*, 678 F.2d at 785)). In addition, "[p]arties are bound by *res judicata* as to both matters decided and matters which could have been raised once a court of competent jurisdiction has entered a final judgment on the merits of an action." *Russell*, 678 F.2d at 785)(citing *Roberts v. United States*, 423 F. Supp. 1314, 1317 (C.D. Cal. 1976)(prior Tax Court decision on the merits is absolute bar to all matters which might have been decided)). In fact, the Ninth Circuit specifically held in Plaintiff's appeal of his second action that any challenge **[*15]** of his tax assessments was barred by *res judicata*:

> The Tax Court properly sustained the collection action because Holdner was precluded from challenging the validity of the underlying tax assessments, as the matter had been resolved in prior litigation. *See* 26 U.S.C. §§ 6330(c)(2)(B), 6330(c)(4)(A)(i)(limiting issues a taxpayer may challenge at a Collection Due Process hearing); *Comm'r v. Sunnen*, 333 U.S. 591, 598-99, 68 S. Ct. 715, 92 L. Ed. 898 (1948)(discussing the application of *res judicata* principles in tax litigation); *Mpoyo v. Litton Electro—Optical Sys.*, 430 F.3d 985, 988 (9th Cir. 2005)(summary judgment is a final judgment on the merits for *res judicata* purposes); *Baker v. IRS (In re Baker)*, 74 F.3d 906, 910 (9th Cir. 1996)(*res judicata* precludes relitigation of issues that were or could have been raised in the prior action; "once a taxpayer's liability for a particular year is litigated, 'a judgment on the merits is *res judicata* as to any subsequent proceeding involving the same claim and the same tax year.'" (citation omitted)).

*Holdner v. C.I.R.*, 623 F. App'x 892, 893 (9th Cir. 2015).

Here Plaintiff seeks to challenge for a third time the deficiency and penalty assessments for tax years 2004-2006. The issues Plaintiff raises in this action are one that he either raised or could have raised in his previous two tax actions. It is undisputed that the Tax Court has twice sustained the IRS and the Ninth Circuit has twice affirmed the Tax Court. The Court, **[*16]** therefore, concludes even if this Court has

subject-matter jurisdiction, Plaintiff's claim is barred by *res judicata*.

Accordingly, the Court grants Defendant's Motion to Dismiss and dismisses this matter with prejudice.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendant's Motion (#15) to Dismiss for Lack of Subject-Matter Jurisdiction, Failure to State a Claim for Relief, and Res Judicata and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 23rd day of November, 2016.

/s/ Anna J. Brown

ANNA J. BROWN

United States District Judge

---

*End of Document*

APPEAL,PARTCONS,TERMINATED

# U.S. District Court
## District of Oregon (Portland (3))
## CIVIL DOCKET FOR CASE # 3:16-cv-00475-BR

Holdner v. Commissioner of Internal Revenue | Date Filed: 03/18/2016
Assigned to: Judge Anna J. Brown | Date Terminated: 11/23/2016
Case in other court: 9th Circuit Court of Appeals, 16-36046 | Jury Demand: None
Cause: 28:2201 Declaratory Judgment | Nature of Suit: 890 Other Statutory Actions
| Jurisdiction: Federal Question

**Plaintiff**

**William F. Holdner**
*doing business as*
Holdner Farms

represented by   **William F. Holdner**
975 SE Sandy Blvd
Portland, OR 97214
(503)233-4601
Fax: 503-233-5125
PRO SE

V.

**Defendant**

**Commissioner of Internal Revenue**

represented by   **Dylan C. Cerling**
Department of Justice, Tax Division
Western Region
P.O. Box 683, Ben Franklin Station
Washington, DC 20044
202-616-3395
Fax: 202-307-0054
Email: dylan.c.cerling@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/18/2016 | 1 | Complaint. Filing fee in the amount of $400 collected. Receipt No. 66496.. Filed by William F. Holdner against Commissioner of Internal Revenue (Attachments: # 1 Exhibit to complaint). (cib) (Entered: 03/21/2016) |
| 03/18/2016 | 2 | Notice of Case Assignment to Judge Anna J. Brown and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5**. Discovery is to be completed by 7/18/2016. Joint Alternate Dispute Resolution Report is due by 8/15/2016. |

**EXHIBIT B**
**28 of 32**
**EXHIBIT 6**
**1 of 4**

| | | Pretrial Order is due by 8/15/2016. Ordered by Judge Anna J. Brown. (cib) (Entered: 03/21/2016) |
|---|---|---|
| 03/21/2016 | 3 | Clerk's Notice of Mailing to William F. Holdner regarding Discovery order, 2 . (cib) (Entered: 03/21/2016) |
| 03/21/2016 | 5 | Summons Issued as to Commissioner of Internal Revenue. (cib) (Entered: 05/20/2016) |
| 05/20/2016 | 6 | Return of Service Executed as to Commissioner of Internal Revenue served on 3/26/2016. (cib) (Entered: 05/20/2016) |
| 06/14/2016 | 7 | Order by Judge Anna J. Brown. Plaintiff filed a return of service on the Commissioner of Internal Revenue on 5/20/2016, however service is still not complete per Federal Rule of Civil Procedures 4(i). Plaintiff is directed to complete service no later than 7/15/2016 or case may be dismissed for failure to prosecute. Copy mailed to Plaintiff on 6/14/2016. (bb) (Entered: 06/14/2016) |
| 07/08/2016 | 8 | Amended Return of Service Executed as to Commissioner of Internal Revenue served on 3/26/2016, answer due on 4/18/2016. (dsg) (Entered: 07/12/2016) |
| 07/27/2016 | 9 | Order by Judge Anna J. Brown. The Court has received Plaintiff's Amended Return of Service in which he has served the Commissioner of the Internal Revenue Service. Plaintiff, however, has failed also to serve the United States Attorney for the District of Oregon and the United States Attorney General as required by Federal Rule of Civil Procedure 4(i)(1)(A)(i). The Court, therefore, DIRECTS Plaintiff to complete service on Billy Williams, United States Attorney for the District of Oregon, United States Courthouse, 1000 S.W. Third, Portland, OR 97204, and Loretta Lynch, United States Attorney General, United States Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530, and to file with the Court a return of service when service has been executed. The Court also DIRECTS the Clerk to provide to Plaintiff a Form of Summons and Proof of Service for each person listed above.Proof of service as to these two entities must be filed no later than 8/26/2016. (bb) (Entered: 07/27/2016) |
| 07/27/2016 | 10 | Summons Issued as to the United States Attorney for the District of Oregon and the United States Attorney General for the Commissioner of Internal Revenue. (msk) (Entered: 07/27/2016) |
| 07/27/2016 | 11 | Clerk's Notice of Mailing to William F. Holdner regarding Summons Issued 10 . (msk) (Entered: 07/27/2016) |
| 08/25/2016 | 12 | Return of Service Executed as to Commissioner of Internal Revenue. Service specifically made upon U.S. Attorney General served on 8/15/2016. (kms) Modified on 8/30/2016 (kms). (Entered: 08/29/2016) |
| 08/25/2016 | 13 | Return of Service Executed as to Commissioner of Internal Revenue. Service specifically made upon Local U.S. Attorney served on 8/17/2016; answer due 10/14/2016. (kms) Modified on 8/30/2016 (kms). (Entered: 08/29/2016) |

**EXHIBIT B**
**29 of 32**
**EXHIBIT 6**
**2 of 4**

| | | |
|---|---|---|
| 09/08/2016 | 14 | Return of Service Executed as to Commissioner of Internal Revenue. Service specifically made upon U.S. Attorney General served on 8/22/16. (cib) (Entered: 09/09/2016) |
| 09/21/2016 | 15 | Motion to Dismiss for Lack of Jurisdiction (*Subject-Matter*), Motion to Dismiss for Failure to State a Claim . Filed by Commissioner of Internal Revenue. (Cerling, Dylan) (Entered: 09/21/2016) |
| 09/21/2016 | 16 | Declaration of Dylan Cerling *in support of motion to dismiss*. Filed by Commissioner of Internal Revenue. (Related document(s): Motion to Dismiss/Lack of Jurisdiction, Motion to Dismiss for Failure to State a Claim 15 .) (Attachments: # 1 Exhibit 1 - 2004 4340 transcript, # 2 Exhibit 2 - 2005 4340 transcript, # 3 Exhibit 3 - 2006 4340 transcript, # 4 Exhibit 4 - 2010 Tax Court Decision, # 5 Exhibit 5 - 2010 Tax Court order on motion for reconsideration, # 6 Exhibit 6 - 2012 9th Circuit decision affirming Tax Court, # 7 Exhibit 7 - 2013 Tax Court Decision, # 8 Exhibit 8 - 2015 9th Circuit decision affirming Tax Court) (Cerling, Dylan) (Entered: 09/21/2016) |
| 09/22/2016 | 17 | Order by Judge Anna J. Brown. Plaintiff's response to Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction, Failure to State a Claim for Relief, and Res Judicata 15 (filed 9/21/16) is due 10/11/16. Defendant's replyin support of its Motion to Dismiss is due 10/28/16. The Court will take the Motion under advisement on 10/28/16. (bb) (Entered: 09/22/2016) |
| 09/22/2016 | 18 | Clerk's Notice of Mailing to William Holdner copy of Order #17 on 9/23/2016. (bb) (Entered: 09/22/2016) |
| 10/07/2016 | 19 | Objection To Defendant's Motion to Dismiss for Lack of Jurisdiction (*Subject-Matter*) Motion to Dismiss for Failure to State a Claim 15 . Filed by William F. Holdner. (Attachments: # 1 Exhibit To Objection to Defendant's Motion To Dismiss) (cib) (Entered: 10/12/2016) |
| 10/07/2016 | 20 | Affidavit of William Holdner In Objection To Defendant's Motion To Dismiss. Filed by William F. Holdner. (Related document(s): Objection to Motion, 19 .) (cib) (Entered: 10/12/2016) |
| 10/20/2016 | 21 | Reply *to Plaintiff's response* to Motion to Dismiss for Lack of Jurisdiction (*Subject-Matter*) Motion to Dismiss for Failure to State a Claim 15 . Filed by Commissioner of Internal Revenue. (Cerling, Dylan) (Entered: 10/20/2016) |
| 11/23/2016 | 22 | **ORDER:** Granting Defendant's Motion 15 to Dismiss Case for Lack of Jurisdiction and for Failure to State a Claim. Signed on 11/23/2016 by Judge Anna J. Brown. (br4) (Entered: 11/23/2016) |
| 11/23/2016 | 23 | Judgment of dismissal with prejudice. Signed on 11/23/2016 by Judge Anna J. Brown. (br4) (Main Document 23 replaced on 11/23/2016) (eo). (Entered: 11/23/2016) |
| 11/23/2016 | 24 | Clerk's Notice of Mailing. Copies of Opinion and Order 22 and Judgment 23 mailed to Plaintiff this date. (br4) (Entered: 11/23/2016) |

**EXHIBIT B**
**30 of 32**
**EXHIBIT 6**
**3 of 4**

| | | |
|---|---|---|
| 11/23/2016 | 25 | Order for Administrative Correction of the Record pursuant to Fed. R. Civ. P. 60(a). A Clerical error has been discovered in the case record. The Clerk is directed to make the following administrative corrections to the record: The date of the Court's Order referenced in the Judgment 23 was incorrect. The date has been corrected to reflect 11/23/2016 as the date of the Court's Order 22 . (br4) (Entered: 11/23/2016) |
| 12/13/2016 | 26 | Notice of Appeal to the 9th Circuit. Related Documents: Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Dismiss for Failure to State a Claim 22 , Judgment 23 Filing fee in amount of $505 collected; Receipt No. 70428 issued. Filed by William F. Holdner. (Attachments: # 1 Certificate of Service) (cib) (Entered: 12/15/2016) |
| 12/19/2016 | | USCA Case Number and Notice confirming Docketing Record on Appeal re Notice of Appeal 26 . **Case Appealed to 9th Circuit Court of Appeals Case Number 16-36046** assigned. (jtj) (Entered: 12/19/2016) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/03/2017 11:47:45 | | |
| **PACER Login:** | justinleonard:3930500:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:16-cv-00475-BR Start date: 1/1/1970 End date: 2/3/2017 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**EXHIBIT B**

**31 of 32**
**EXHIBIT 6**
**4 of 4**

# Case Query

### 16-36046 William Holdner v. CIR

| Associated Case | Short Title | | Type | Start | End | Status |
|---|---|---|---|---|---|---|
| 16-35723 | William Holdner v. Katy Coba, et al | | Related | 12/16/2016 | | open |

| Originating Case | Lead Case | Filed | Execution Date | Judgment | NOA | Originating Judge | Court Reporter |
|---|---|---|---|---|---|---|---|
| 3:16-cv-00475-BR | | 03/18/2016 | | 11/23/2016 | 12/13/2016 | Brown, Anna J. | |

| Party | Party Type | Terminated from Case | Attorney |
|---|---|---|---|
| Holdner, William F. | Plaintiff-Appellant | | |
| Commissioner of Internal Revenue | Defendant-Appellee | | Caldarone,Richard Cerling,Dylan C. |

| Attorney | Party Type(s) Represented | Representation End |
|---|---|---|
| Caldarone, Richard | Defendant-Appellee | |
| Cerling, Dylan C. | Defendant-Appellee | 12/29/2016 |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| U.S. Court of Appeals for the 9th Circuit - 02/03/2017 11:47:12 | | |
| **PACER Login:** | justinleonard | **Client Code:** | |
| **Description:** | Case Query | **Search Criteria:** | 16-36046 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

EXHIBIT B

32 of 32

EXHIBIT 7

1 of 1